674 P.2d 443

STATE of Idaho, Plaintiff-Respondent,

v.

Horacio SILVA, Defendant-Appellant.

STATE of Idaho, Plaintiff-Respondent,

v.

Rafael SILVA, Defendant-Appellant.

No. 13762, 13831.

Court of Appeals of Idaho.

Dec. 6, 1983.

Larry C. Ashcraft, Mountain Home, for defendant-appellant Horacio Silva.

Francis H. Hicks, Mountain Home, for defendant-appellant Rafael Silva.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Myrna A.I. Stahman, Deputy Atty. Gen., Boise, for plaintiff-respondent.

WALTERS, Chief Judge.

The nude body of a young woman was found by the side of a country road in Elmore County on the morning of February 3, 1979. Two brothers, Rafael and Horacio Silva, were arrested and charged with murder and rape, within a few days after discovery of the body. However, an autopsy report later indicated that the woman had died from acute alcohol intoxication. The state then amended the charges against the Silvas, by abandoning the homicide count and by alleging conspiracy to commit rape, in addition to the original rape charge, against each of them. When the case came to trial, the court granted a motion by the state to dismiss the conspiracy count, and a jury found Horacio guilty of rape and Rafael guilty of the lesser included offense of attempted rape. Both Silvas appeal from their judgments of conviction.

We are asked to decide the following issues: (a) whether the appeal of Horacio Silva should be dismissed because his notice of appeal was prematurely filed; (b) whether incriminating statements, made by Horacio Silva to the police, should have been excluded as evidence at trial; (c) whether Horacio Silva should have been allowed to testify at trial for the limited purpose of contesting the voluntariness of his waiver of constitutional rights at the time he gave his statement to the police; and (d) whether the trial court erred in denying a motion by both Silvas for a mistrial. For reasons stated below, we deny the state's motion to

dismiss Horacio's appeal and we affirm the convictions.

## I. *Motion to Dismiss Horacio Silva's Appeal*

After all briefs on appeal were filed, the state moved to dismiss the appeal of Horacio Silva, because his notice of appeal had been filed four days before the written judgment of conviction was entered. The state contends that the prematurity of the notice of appeal deprives this Court of jurisdiction to entertain Horacio's appeal. However, the notice was filed after the district court orally had adjudged Horacio guilty of rape and had pronounced sentence, in open court. Under similar circumstances, in a case decided while Horacio's appeal was pending, we held that such a notice of appeal matured and vested jurisdiction in the appellate court, upon the subsequent entry of a written, appealable order or judgment. *See State v. Gissel,* 105 Idaho 287, 668 P.2d 1018 (Ct.App.1983), *review denied,* Oct. 5, 1983. Pursuant to *Gissel,* we hold that our court is not deprived of jurisdiction to entertain Horacio's appeal. We therefore deny the state's motion to dismiss.

## II. *Incriminating Statements by Horacio Silva*

Prior to his arrest, Horacio Silva was interviewed by the investigating officers. He made incriminating statements which were introduced at trial over his objection. On appeal he argues that the statements were obtained involuntarily, violating his constitutional privilege against self-incrimination. He further argues that he should have been allowed to give limited testimony at trial concerning the involuntariness of those statements. We will examine these arguments in turn.

### A

The events leading up to Horacio's statements occurred as follows. The residences of both Silva brothers were located on Hog Farm Road, the same road where the victim's body was found. For reasons not disclosed by the record, Horacio had been at the police station during the evening before the morning of February 3 when the body was discovered. He had left at about one o'clock a.m. to go home. On February 4, the day after the body had been found, the investigating officers decided to talk to Horacio. At trial, one of those officers, Deputy Wiese, testified:

> We had information that Horacio had gotten home quite late on Friday night or early—actually early Saturday morning. Since he lives on the Hog Farm Road, we felt that he might have seen a vehicle or seen something on his way home that, you know, might produce a lead as, you know, to the ... girl. Therefore, we were attempting to contact him just to follow up on any possible leads.

The officers proceeded to Hog Farm Road. There they stopped a vehicle which they thought was being driven by Horacio Silva. The driver turned out to be Rafael, Horacio's brother. Officer Wiese further testified:

> As I stated before, I was quite surprised when we pulled up that it was Rafael. Originally I thought it was Horacio. Since the reserve officer had stopped him, I went ahead and walked up to him to inform him of the reason why he had been stopped. I asked him where his brother was, Horacio, and, of course, he wanted to know why I wanted to speak to him. Explained to him at that time that the [girl] had been found dead, you know, a little ways up the road.
>
> Subsequently, I also informed him that we understood that he was out, Horacio had been, you know, gotten home late Saturday morning or early Saturday morning, and that we just wanted to talk to him to see if he had seen anything, possibly, you know, a vehicle or people walking along the road or anything that might be, you know, helpful in the investigation.
>
> At that time, Rafael informed me that his brother was in American Falls, and subsequently I asked him when he was due home.
>
> Rafael said later on in the day.

I asked him if he would give his brother a message to contact the station and either ask for myself or Detective Freeman so that we could ask him, you know, if he had seen anything.

Wiese then asked Rafael if he was acquainted with the victim. Rafael stated that he was and that he had seen her in a bar in Mountain Home, Idaho, the night before her body was found. He told the officer that the victim was still in the bar when he left the establishment. After this conversation, the officer allowed Rafael to leave. The officers then returned to Mountain Home and interviewed the bartender of the place where Rafael had seen the girl. Later that same day, they returned to Hog Farm Road to "recontact" Rafael. Rafael was not at home, so the officers posted a vehicle on the road to wait for him. When Rafael arrived, the officers advised him of his *Miranda* rights. Rafael signed a "notification of rights" form and agreed to talk to the officers. Officer Wiese testified:

> I stated to Rafael that I was still investigating the . . . case. I then asked him if he was in fact the individual who had picked [the victim] up at the Royal Club, had subsequently had her for most of the night and into the daylight hours of the 3rd day of February, and that if he was the one who in fact dumped her body on the west side of the railroad tracks on Hog Farm Road. He indicated to me that he was. In fact, his words were, quote-unquote, "Yes, I am." I then asked him if—I then actually told him that I'd like to, you know, discuss this further, and he informed me that he would be willing to discuss it further with me, but that, since he had his family in his car, he would like to make arrangements to have them taken to his house.

One of the officers then took Rafael's family to their home. Rafael proceeded to make a detailed statement to the officers. Rafael admitted meeting the victim at a bar in Mountain Home. He stated that he took her in his car to a remote location where she became unconscious. He said that he removed her clothing and "messed around" with her, but denied having had any sexual relations with her. Rafael stated that she became "cold" and did not regain consciousness. He disclosed that because he was scared, he "dumped" her by the side of the road.

Rafael was then taken into Mountain Home, to the county law enforcement building, where he reiterated his statements, in a taped interview, after again being advised of his *Miranda* rights. However, Rafael's statements were not entirely consistent with what the officers already knew about the case. Part of the victim's clothing had been found beneath her body, but Rafael stated during the taped interview that he could not find her clothing when he removed the body from his car, and he denied leaving the clothing with the body. He also described the location where he claimed to have left the body, which was different from where the body was actually found.

At approximately 1:45 a.m. on February 5, a few hours after Rafael's arrest, Horacio called Detective Freeman on the telephone. He said that he had heard that Freeman wanted to talk to him and he offered to come to the law enforcement building. Freeman assented and Horacio voluntarily appeared at Freeman's office about ten minutes later. Horacio was taken to a conference room to be interviewed. Detective Freeman and a state patrolman, Officer Wills, were present during the interview. The interview produced self-incriminating statements. At a subsequent hearing on Horacio's motion to suppress the statements, Detective Freeman (who was acquainted with Horacio and who conducted the interview) testified that, at the outset, he had advised Horacio of his *Miranda* rights:

> And this was more out of force of habit than anything else, because I was looking at him as a possible witness, but definitely not as a possible suspect at the time. And I thought, being he'd come in on his own and he had made the—the offer, that it was more out of force of habit than an interrogation type interview. It wasn't even intended for that.

The interview was tape-recorded. After having advised Horacio of his rights, Freeman asked Horacio if he would answer some questions. Horacio replied, "Well, I don't know what's going on here." Freeman then offered to "explain it" to him. The detective told Horacio it was in reference to the death of a girl. He stated her name and asked Horacio if he knew her. Horacio answered in the affirmative and identified the place where she had worked. Freeman then said, "We need to ask you some questions about her death. Would you talk to us about it and tell us what you know?" Horacio replied, "Well, I don't think so." Freeman then declared the interview over and turned off the tape recorder. While the recorder was off, the following transpired, according to Freeman's testimony during the suppression hearing:

A. A conversation ensued in the meantime, and this is when I made an attempt to explain to Horacio, you know, what we were attempting to do and that he was not under arrest, and this was the conversation, because he had indicated that he didn't really understand what was going on, and he asked, you know, if—if Rafael was in jail; he went into it on what he was charged with, or if he was charged, and it was a general conversation for him to find out what was going on, is the way that I interpreted the conversation.

Q. [by defense counsel]: Now, when you resumed the interview and turned the tape back on—

A. Uh-huh.

Q. —do you recall that Officer Wills made a statement at that time, I believe, to the effect that, "You're ready to answer questions now?", referring to Horacio?

A. Yes sir.

Q. And Horacio said, "No"?

A. I don't remember his exact oral response, but throughout, once the tape had—had been turned back on, I was thoroughly under the impression that Horacio was talking willingly.

When the tape recorder was turned on again, Freeman said "I'm not going to say you won't be charged with something, but you're not going to go to jail tonight if you tell the truth. I'm not telling you that you're going to jail if you don't talk but, what I mean is, damn it, we have got a girl that is dead and we just can't ignore that. You know that." After again stating the time and place of the interview and that they now understood that Horacio was "ready to level" with them, without audible comment from Horacio, one of the officers then said "no promises or threats have been made, right? Okay, you want to tell us exactly what the situation is? . . . Let's start from the beginning, okay?" Horacio answered "okay" and began narrating his participation in the events in question, interrupted only by requests for clarification.

Horacio related that Rafael had brought the unconscious and unclothed victim to his, Horacio's, residence during the early morning hours of February 3. Horacio said that the two of them moved her and her clothing from Rafael's vehicle to Horacio's automobile. Rafael then left. Horacio further stated that he subsequently had intercourse with her and eventually placed the body in the location where it was found. Horacio also disclosed that he had placed some of the clothing with the body. He directed the officers to another location where additional items of clothing were later found, after the interview.

At the completion of Horacio's interview, because of inconsistencies between the versions given by the two brothers, they were reinterrogated together. At the conclusion of that interview Horacio inquired as to whether he was going to be arrested. The officers responded that they were unsure; that the prosecutor would have to review the case first. The officers told Horacio he was free to leave but requested that he return to the sheriff's office later that day. Horacio then left the police station. He returned later that day, pursuant to the understanding with the detectives. He was then arrested.

Horacio moved to suppress admission of his statements, as evidence, both before and during the trial. He did not testify in support of his motions. The motions were denied. The district court found that the questioning was not "pursuant to a custodial interrogation," that Horacio's statements were not "coerced in violation of his rights against self-incrimination," and that Horacio "had made a knowing, voluntary, intelligent waiver of his right to remain silent at the time he made the statements."

Because the question of custodial interrogation is a threshold inquiry to discussion of the voluntariness of his statements, we will address it first. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court held that the prosecution may not use, at trial, incriminating statements made during a custodial interrogation unless the defendant was advised of specific constitutional rights and the police honored those rights if invoked. Among those rights is the right to silence, or what has come to be known as the right to cut off questioning. *See Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). In the present case Horacio was advised of his rights but his right to cut off questioning arguably was infringed when the police continued talking with him about the investigation after he said he did not want to answer questions. Whether this would render the statements later made inadmissible depends upon whether the interview was a custodial interrogation governed by *Miranda.*

*Miranda* itself referred to custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S.Ct. at 1612. *Accord, State v. Ybarra,* 102 Idaho 573, 634 P.2d 435 (1981). The question whether interrogation is custodial or non-custodial in nature, in circumstances quite similar to those present here, also has been considered in subsequent United States Supreme Court decisions. In *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), Mathiason, on parole at the time, voluntarily appeared at a police station at the request of a police officer. The two sat at a desk in a closed office at the police station. The police officer told Mathiason that he believed Mathiason was involved in a burglary, that Mathiason's truthfulness would possibly be considered by the district attorney or a judge, and that Mathiason's fingerprints had been found at the scene. The latter statement was not true. After a pause of a few minutes, Mathiason admitted he had taken the property.

In response to the contention that the questioning constituted custodial interrogation, for which *Miranda* warnings are required, the United States Supreme Court held that

> there is no indication that the questioning took place in a context where [Mathiason's] freedom to depart was restricted in any way. He came voluntarily to the police station, where he was immediately informed that he was not under arrest. At the close of a ½-hour interview [he] did in fact leave the police station without hindrance. It is clear from these facts that Mathiason was not in custody "or otherwise deprived of his freedom of action in any significant way." [429 U.S. at 495, 97 S.Ct. at 714.]

In a more recent case, *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), the United States Supreme Court again addressed an interview at a police station, in the context of whether the person interviewed was "in custody." The facts of the case, as reported in the Court's opinion, are as follows:

> The respondent, Jerry Beheler, and several acquaintances, attempted to steal a quantity of hashish from Peggy Dean, who was selling the drug in the parking lot of a liquor store. Dean was killed by Beheler's companion and step-brother, Danny Wilbanks, when she refused to relinquish her hashish. Shortly thereafter, Beheler called the police, who arrived almost immediately.... He told the police that Wilbanks had killed the victim,

and that other companions had hidden the gun in the Behelers' backyard. Beheler gave consent to search the yard and the gun was found. Later that evening, Beheler voluntarily agreed to accompany police to the station house, although the police specifically told Beheler that he was not under arrest.

At the station house, Beheler agreed to talk to police about the murder, although the police did not advise Beheler of the rights provided him under *Miranda v. Arizona,* [citation omitted]. The interview lasted less than 30 minutes. After being told that his statement would be evaluated by the district attorney, Beheler was permitted to return to his home. Five days later, Beheler was arrested in connection with the Dean murder. After he was fully advised of his Miranda rights, he waived those rights and gave a second, taped confession during which he admitted that his earlier interview with the police had been given voluntarily. The trial court found that it was not necessary for police to advise Beheler of his Miranda rights prior to the first interview, and Beheler's statements at both interviews were admitted into evidence. The California Court of Appeal reversed Beheler's conviction for aiding and abetting first-degree murder, holding that the first interview with police constituted custodial interrogation, which activated the need for Miranda warnings. The court focused on the fact that the interview took place in the station house, that before the station house interview the police had already identified Beheler as a suspect in the case because Beheler had discussed the murder with police earlier, and that the interview was designed to produce incriminating responses. Although the indicia of arrest were not present, the balancing of the other factors led the court to conclude that the State "has not met its burden of establishing that [Beheler] was not in custody" during the first interview.

At ———————, 103 S.Ct. at 3518–19, 77 L.Ed.2d at 1277–78. The United States Supreme Court reversed the California appellate court. Citing *Mathiason,* the Court said:

> Although the circumstances of each case must certainly influence a determination of whether a suspect is "in custody" for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.

At ———, 103 S.Ct. at 3519, 77 L.Ed.2d at 1279. Applying this rule, the Court concluded that "Beheler was neither taken into custody nor significantly deprived of his freedom of action. Indeed, Beheler's freedom was not restricted in any way whatsoever" when he was interviewed at the police station. *Id.* at ———, 103 S.Ct. at 3519, 77 L.Ed.2d at 1278.

■ Here, Silva voluntarily appeared at the sheriff's office. He was advised at the outset that he was not under arrest. His freedom was not restrained to the degree associated with a formal arrest. He was allowed to leave after the interview. In light of *Mathiason* and *Beheler,* we hold that Silva was not in custody for purposes of *Miranda.* Consequently, the police did not violate any *Miranda*-based right by continuing to talk with him after he said he did not want to answer questions.

However, our inquiry does not end at this point. We will next address the voluntariness of Horacio's statements even though they were made under noncustodial circumstances. In *Beckwith v. United States,* 425 U.S. 341, 347–348, 96 S.Ct. 1612, 1616–1617, 48 L.Ed.2d 1 (1976) the United States Supreme Court said:

> We recognize, of course, that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, to be [sic] characterized as one where "the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . ." [Citation omitted.] When such a claim is raised, it is the duty of an appellate court, including this Court, "to

examine the entire record and make an independent determination of the ultimate issue of voluntariness." [Citation omitted.] Proof that some kind of warnings were given or that none were given would be relevant evidence only on the issue of whether the questioning was in fact coercive. [Citations omitted.]

■ Horacio submits that the involuntariness of his statements is demonstrated by the circumstances of the interrogation. He contends those circumstances were as follows. The interrogation occurred inside the law enforcement building where Horacio was cut off from "any family, moral, or other support." In his brief, he submits that the interview was conducted by the two officers as a "Mutt and Jeff" confrontation—"[t]hat being Officer Freeman, a friend of Horacio Silva's, in whom he thought he could confide, and the angry, large, uniformed Officer Wills of the State Police." The officers advised him of his *Miranda* rights, which, Horacio contends, evidenced an intent by the officers to use any statement they obtained from him against him. He asserts that, during the period of time the tape recorder was not operating in the course of the interview, "booking papers" were brought into the conference room—leading him to believe he was about to be arrested. He claims the voices of the officers, during the taped portion of the interview, show the officers "were extremely hostile and upset," and demonstrates anger on the part of the officers. Relying on these contentions, Horacio urges that the totality of the circumstances show that his statements were coerced and were not voluntary.

However, we cannot decide a case upon contentions. We must decide it upon the record. We have reviewed the transcripts provided to us both of the suppression hearing and of the trial. Horacio did not testify on either occasion; only the officers testified. That testimony supports none of Horacio's assertions, with the exception that the interview took place in private at the law enforcement building. There is no testimony, as opposed to questions, which

would affirmatively establish that any "booking papers" were brought into the interrogation room. We have listened to the tape recording of the interview. That recording indicates Silva was speaking voluntarily. From the tone of the officers' voices we detect no anger or hostility. We do note, as quoted earlier, that Detective Freeman mentioned—in an arguably ambiguous way—the question of going to jail. But when we weigh this remark against the entire record we deem it insufficient to show that Horacio's will was overborne or that his decision to speak was not self-determined. The preponderance of the evidence in the record before us establishes the voluntariness of Horacio's statements. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). We conclude, as did the trial court, that Horacio's statements were made voluntarily and were admissible at trial.

B

■ Horacio next argues that the court refused to allow him to testify, at trial, without the jury being present, to rebut certain testimony of Detective Freeman, concerning the confession interview. This issue came about as follows. While the jury was in the courtroom, Freeman was asked by the prosecutor to read—from a transcript of the interview—Horacio's answers to the officer's interrogation. At the point in time when the tape recorder had been turned off and then turned back on, Officer Wills had stated "and you are willing to level with us, no promises or threats have been made, right? Okay, you want to tell us exactly what the situation is?" The prosecutor then asked Freeman if there was any response by Horacio to Wills' question. Freeman answered, "I don't remember at this time. But none was transcribed." Counsel for Horacio then objected, and the jury was excused from the room while it was determined whether Horacio had assented to proceeding with the interview by the officers. A further examination of Freeman, outside the presence of the jury, was conducted:

[By the Prosecutor]: Q. I ask you, Chief Freeman, at the conclusion of Rich Wills' question, whether or not there was a response to that by Horacio.

A. What I understood you to meant—to mean, this afternoon, I was advised to read what was on the transcript, and this is what I responded to, that there was no indication here. I'm sorry. It was my error. I didn't realize you were referring to the original interview.

Q. Okay, Let's go back to the—the jury is not present at this time, then.

Regarding to [sic] the question, then, was there any response by Horacio?

A. Yes, there was.

. . . . .

Q. What responses [sic] was made, Chief Freeman, throughout that question by Officer Wills?

A. That was where he, in the actual interview that morning, he nodded, and there was also an audible response; however, to my knowledge, it did not come out on the tape.

Q. You say he nodded. What way?

A. He nodded in the affirmative.

Q. And his head would be nodding which way, in what direction?

A. Up and down type.

Q. Had any threats been made against him?

A. No, there hadn't.

At the conclusion of the prosecutor's questioning, the court interrogated Detective Freeman, as follows:

Q. —and Line 16, "Okay, you want to tell us exactly what the situation is?"

Was there a specific response to that question?

A. I—yes, sir, in the room, there was, but not on this transcript. And I apologize to the Court for not understanding the question.

Q. At the time of the interview, there was at that point—

A. Yes, sir.

Q. —a specific response?

A. Yes, sir.

Q. And what was the response he made?

A. There was a nod of the head and—and there was an audible response that I could hear in the—in the room, because I was sitting almost in front of him. He was at the end of the table like here; he would have been sitting here.

Q. Well—

A. And I heard it and, regretfully, the tape didn't pick it up.

Q. What was the audible response?

A. Kind of a "yeah" and a nod. It was an affirmative response. I—you know, I don't remember the distinct words, but the interview definitely would not have gone on had—had there not been a positive response.

When the court was finished, defense counsel questioned Detective Freeman. The attorney focused on the difference between the transcript, which did not report a response from Horacio, and Freeman's testimony that he observed an affirmative nodding of Horacio's head and heard Horacio say "yeah". Freeman's answers were consistent with his above quoted testimony.

Defense counsel then addressed the court. He said:

Well, Your Honor, I submit to the Court that at this point, with that kind of discrepancy in the testimony, that the defendant, Horacio Silva, should be allowed to testify on that point and that point alone without endangering himself to further examination, for a purpose of suppression. I submit to the Court that that's not what happened at that point.

The Court responded:

Well, I'm going to deny it and go ahead with the trial. I think [Freeman's] testimony at this point is entirely consistent with his testimony at the suppression hearing. At that time, as [the prosecutor] pointed out, Horacio could have testified; he didn't; I made the ruling; I denied your motion to suppress. You never renewed it. . . . I think [Detective Freeman's] explanation as to the answer he gave while the jury was present when [the prosecutor] was asking him is understandable. We are working on a tran-

script at this time. There was a doubt in my mind. It's been cleared up now, because he has now explained consistent with the explanation he made at the motion to suppress evidence as to what happened at that time. And I'm satisfied. I think we're back at the point we were at the end of the motion to suppress evidence when I denied the motion, and I again am overruling your objection. I think we ought to proceed with the trial. Bring the jury in, Mr. Bailiff.

As noted, Horacio now argues that he was deprived of an opportunity to state his understanding of what happened in regard to his assent to continuation of the interview. He contends it was error for the court not to allow a limited suppression hearing in the midst of the trial. We disagree.

Due process entitles a criminal defendant to a pretrial hearing to determine the voluntariness of any incriminating statements the prosecutor intends to use against him. *Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). But due process does not require multiple suppression hearings. Horacio had his hearing before trial, and he did not choose to testify at that hearing. Moreover, had Horacio desired to dispute Detective Freeman's testimony at trial, he could have done so. He was free to take the stand at the close of the state's case and testify on his own behalf regarding the circumstances of the interview, to affect the weight to be given by the jury to the interview statements. *See State v. Dillon,* 93 Idaho 698, 471 P.2d 553 (1970); *State v. Fisk,* 92 Idaho 675, 448 P.2d 768 (1968). He did not do so. We find neither error nor prejudice in the trial court's refusal to hold a limited suppression hearing.

### III. *Mistrial Motion*

▮ Both Silvas contend that the trial court should have granted their motion for mistrial because, at trial, the state's expert witness, a pathologist, added to his original opinion of the cause of death of the victim—acute alcohol intoxication—with the further contributing cause of hypothermia.

The Silvas argue that the reference to hypothermia was a change in testimony from that earlier given at their preliminary hearing, and was also a change from the doctor's autopsy report provided to them prior to trial. They submit that the cause of death was not relevant to the rape charges, and, because they were not being tried in connection with the death, testimony which implied they were responsible for the woman's death by hypothermia would prejudice the jury in determining their guilt or innocence on charges of rape.

The autopsy report designated the cause of death as "acute alcohol intoxication." The pathologist testified at the preliminary hearing as follows:

Q Did you arrive at a cause of death, Doctor?

. . . .

A Yes, I did basically, the young lady had a blood-alcohol of .38 miligrams percent. This is on the low range of the blood-alcohol of which death can be caused from acute alcohol intoxication.

Q I take it then, that your conclusion is that she died of alcohol intoxication?

A Yes, I think so. Now there could be complication of mild hypothermia involved, but the findings of hypothermia and the findings of alcohol intoxication as far as stated in the autopsy report, the pulmonary adema and so on are present in both of those desease [sic] states.

He then testified at trial:

Q In the field of—you know, what medical conclusions did you come to?

A As to the cause of death?

Q Okay. Let's take that. Did you come to a conclusion as to the cause of death?

A The cause of death originally I felt was due to acute alcohol intoxication, because of the blood level of .38. This is not necessarily a lethal blood-alcohol level, and in someone who is a young person, 18 or 20 years old, who doesn't drink at all, blood level of .38 would probably be lethal. In an individual who is a heavy drinker, a blood-alcohol level of .38 would almost never be lethal. I don't believe that acute alcohol intoxication is the—is

the only cause. I think it's one of the causes, and I think the other cause in her instance is hypothermia, or reduced body temperature. And I—the—

Q What would cause reduced body temperature?

A Reduced body temperature would be caused by exposure to cold primarily.

Both counsel for the Silvas immediately objected to this testimony on the basis of relevancy, and moved for a mistrial upon the grounds of prejudice and surprise. The trial court ruled that the pathologist's testimony was relevant to establish the time of the victim's death. The court also denied the motion for mistrial. On this appeal, the Silvas take issue only with the mistrial ruling.

It would appear that even if the pathologist's trial testimony had corresponded precisely to his report and preliminary hearing testimony (in which case both counsel for the Silvas concede they would not have objected), the hypothermia still would have been mentioned as a "complicating" factor in the victim's death. The potential for jury prejudice still would have been there. However, the fact of the victim's death could not have been concealed from the jury. Thus the real question is whether the pathologist's trial testimony created such additional prejudice that a mistrial should have been declared.

Rule 29.1, I.C.R., provides that the court may declare a mistrial upon motion of a defendant, "when there occurs during the trial an error or legal defect in the proceedings ... which is prejudicial to the defendant and deprives him of a fair trial." We have recently outlined our standard for review of a refusal to grant a mistrial in criminal cases. We said that while

> rulings on mistrial motions have been characterized as discretionary ... the exercise of such discretion necessarily [must be] reviewed in light of the full record and the outcome of the trial. Consequently, the question on appeal is not whether the trial judge reasonably exercised his discretion in light of circumstances existing when the mistrial motion

was made. Rather, the question must be whether the event which precipitated the motion for mistrial represented reversible error when viewed in the context of the full record. The trial judge's refusal to declare a mistrial will be disturbed only if that incident, viewed retrospectively, constituted reversible error.

*State v. Stoddard,* 105 Idaho 169, 170–171, 667 P.2d 272, 273–274 (Ct.App.1983). *See also State v. Urquhart,* 105 Idaho 92, 665 P.2d 1102 (Ct.App.1983). We further noted that, with the limited exception of certain constitutional violations, errors at trial are not "reversible" unless the defendant shows specific prejudice arising from the alleged error. We held that, even if the error can be shown to have prejudiced the defendant,

> [a]n adjudication of guilt will not be reversed upon a showing of error "if the evidence of the defendant's guilt is satisfactory, that is, such as ordinarily produces moral certainty, or conviction in an unprejudiced mind, and the result would not have been different had the ... [error not occurred]." [Citations omitted.]

*State v. Stoddard, supra,* 105 Idaho at 171, 667 P.2d at 274.

We have reviewed the evidence submitted at the Silvas' trial. The evidence included the Silvas' admission of activities with the victim while she was unconscious and incapable of consenting to their activities. It also included findings by the pathologist of physical manifestations that the victim had experienced sexual intercourse within twelve to fourteen hours before the autopsy was conducted on the afternoon of February 3—the day the body was found. The evidence of Horacio's guilt of the crime of rape, and of Rafael's guilt of the lesser included offense of attempted rape, was, in our view, satisfactorily established. It was such as ordinarily would produce moral certainty, in an unprejudiced mind, of their guilt; and the result would not have been different had the pathologist characterized hypothermia merely as a "complicating factor" in the victim's death. We uphold the district judge's refusal to declare a mistrial.

We note that the trial court gave a "curative" instruction—that the evidence of hypothermia was relevant only as to the time of death and should not be considered by the jury for any other purpose. However, because this case falls so clearly within the harmless error doctrine of *Stoddard* and *Urquhart* we deem it unnecessary to determine the mistrial issue on the basis of the giving of, or the failure to give, such an instruction.

The judgments of conviction are affirmed.

SWANSTROM and BURNETT, JJ., concur.