COURT OF APPEALS OF VIRGINIA


Present:  Judges Baker, Willis and Overton
Argued at Norfolk, Virginia


FREDERICK WEBBER, S/K/A
 FREDERICK WEBER
                                        OPINION BY
v.        Record No. 0621-97-1    JUDGE JERE M. H. WILLIS, JR.
                                        FEBRUARY 17, 1998
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                        Marc Jacobson, Judge

            James O. Broccoletti (Zoby & Broccoletti, on
            briefs), for appellant.

            Eugene Murphy, Assistant Attorney General
            (Richard Cullen, Attorney General, on brief),
            for appellee.


     On appeal, Frederick Weber contends:  (1) that the trial

court erred in refusing to suppress statements he made to the

police; (2) that the evidence was insufficient to support his

conviction for second-degree murder; and (3) that the trial court

erred in refusing to declare a mistrial due to the prosecutor's

improper comments.  We affirm the judgment of the trial court.

                    I.  <u>MOTION TO SUPPRESS</u>

                        A.  <u>BACKGROUND</u>

     On November 17, 1994, around 7:00 p.m., Frederick Weber and

his wife, Robin Weber, brought their twenty-nine-day-old son,

Andrew Joseph Weber, to Norfolk Sentara General Hospital.

Norfolk Police Investigators Evans and Chupik, who were at the

hospital on unrelated business, learned that the circumstances

suggested child abuse.  Beginning at 8:05 p.m., Evans spoke with

Weber for approximately twelve minutes concerning the baby's injuries. Evans and Chupik later learned from Dr. Arlo Zaritsky that the baby's injuries were consistent with Shaken Baby Syndrome.[1]

The baby was transferred to Children's Hospital of the King's Daughters, where he died on November 27, 1994.

On November 17, 1994, from 9:00 p.m. until 9:25 p.m., at Children's Hospital and in the presence of a child protective services worker, Evans spoke with Weber and his wife concerning what had happened to the baby. At 10:55 p.m., Weber and his wife came out of the intensive care unit. Chupik asked Weber, who was visibly upset, how he was doing. Weber replied that he was watching his son die and that the doctor had accused him of causing the baby's injuries. He then said, "I don't want to talk to anybody."

Shortly thereafter, Evans and Chupik told Weber and his wife that "[they] needed to talk to them and [they would] like for

---

[1] Dr. Zaritsky described Shaken Baby Syndrome as "a type of injury that's caused by a very vigorous shaking of a small infant and typically an infant less than a year of age. That occurs presumably because the neck muscles are not as strong, and so the head tends to move back and forth fairly rapidly. And the brain substance is much like jello inside the skull, so the movements in each direction tend to deform or cause the brain to kind of move in a way that's not as fast as the head itself is moving, so it basically is thought to really be bumping on the front side and back side of the skull. And in addition there's tearing of the substance of the brain because of it's [sic] sort of jello or gelatinous nature. And there's literally on a microscopic level tearing of the connections between nerves that are called axons that one can see."

them to come down to the Police Operations Center." Weber testified that when he was asked to go to the police station, he told the officers that he "had talked to [his] mother-in-law and [he] wanted to talk to -- would like to talk to an attorney first." The police officers testified that Weber did not ask to speak to an attorney. Weber and his wife accompanied the officers and were driven to the police station in a police car. Neither was arrested nor placed in handcuffs.

Upon arriving at the police station at 11:12 p.m., Weber and his wife were placed in separate rooms. Evans and Chupik advised Mrs. Weber of her Miranda rights. She requested an attorney, and they questioned her no further.

Shortly after 1:00 a.m., Weber received a "Legal Rights Advice Form," asking him, inter alia, whether he understood that he had a right to remain silent, that he had a right to a lawyer, and that a lawyer would be provided if he could not afford one. He read the form and wrote, "Yes," below each question on the form. He also wrote, "Yes," in the spaces indicating that he understood his rights and that he wished to "waive these rights and desire[d] to make a statement." Weber acknowledged on the form that "[t]his statement is completely free and voluntary on my part without any threat or promise from anyone." He signed the form at 1:11 a.m. Evans then interviewed Weber for thirty-six minutes. During the interview, Weber stated that the baby went limp and he shook and slapped the baby in an attempt to

revive him.  After the interview, Weber was given a soft drink and used the rest room.

The officers interviewed Weber again from 3:00 a.m. until 3:38 a.m.  At 4:05 a.m., Chupik took Weber outside for ten minutes, to get some fresh air and to smoke a cigarette.  From 4:20 a.m. until 4:56 a.m., Weber tape-recorded a statement.  At 6:35 a.m., Weber consented to Chupik's request to search his home.  At 6:36 a.m., Weber went to the bathroom.  At 7:50 a.m., Evans arrested Weber on a charge of felony child neglect.

From 9:07 a.m. until 9:40 a.m., Weber reviewed, corrected, initialed, and signed a copy of his transcribed statement.  When asked at 10:06 a.m. whether he needed or wanted anything, he replied, "no."  At 10:14 a.m., Weber asked to call a friend, "who might have some information about a lawyer."  This request was denied.

Weber was taken to the bathroom at 10:28 a.m. and was given a soft drink at 11:40 a.m.  He agreed to a polygraph examination, which was conducted at 1:12 p.m.  Weber testified that before agreeing to the polygraph examination, he told the police, "I would like to talk to an attorney about it first."  The officers denied that Weber made that request.  The polygraph examiner asked Weber whether he had been sleeping.  Weber replied that he had taken "cat naps."  The examiner displayed a copy of the legal rights form that Weber had signed, and advised him that those legal rights still applied.  At 1:17 p.m., Weber declined the

examiner's offer of water.

At 2:22 p.m., Weber was asked again whether he wanted anything to eat or drink or whether he needed to use the rest room. He declined the offer of food or drink but accepted a cigarette. Officers interviewed Weber from 2:47 p.m. until 3:30 p.m., and from 3:40 p.m. until 4:20 p.m.

From 4:24 p.m. until 4:55 p.m., Sergeant Williams and Investigator Evans interviewed Weber, who then admitted shaking the baby before the baby went limp. Weber testified that the officers told him that "they would be taking me back to see my son after they had gotten what they needed." The officers denied having made that statement. After confessing, Weber began crying very hard, and Williams brought him a glass of water. From 5:15 p.m. until 5:25 p.m., Weber made an audio recording of his statement. The statement included the following dialogue:

BY INV. CHUPIK:

> Q. Fred, you've been down here quite a long time. Have you been treated well during all this time and been offered the use of our facilities and given something to drink and offered something to eat during all this?

> A. Yes.

BY INV. EVANS:

> Q. Has anyone threatened you in any way?

> A. No.

After recording his statement, Weber used the rest room, went outside, returned, and was given a meal from a fast-food

restaurant.  From 6:56 p.m. until 7:05 p.m., Weber reviewed, corrected, and signed his transcribed statement.  He initialed the top and bottom of each page.  He was then transferred to another location for booking.

The trial court denied Weber's motion to suppress the statements he made to the police.

B.    <u>PRE-CUSTODIAL ASSERTION</u>

Weber contends that the police violated his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), by continuing to question him after he stated at the hospital that he did not want to talk to anybody.  Because Weber was not in custody at that time, this assertion did not invoke <u>Miranda</u> protections.

> In a custodial interrogation:
>> Once warnings have been given, the subsequent procedure is clear.  If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.  At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise.

<u>Miranda</u>, 384 U.S. at 473-74.  <u>Miranda</u> forbids continued interrogation of an individual in custody after he has invoked his right to remain silent.  <u>Michigan v. Mosley</u>, 423 U.S. 96, 101 (1975).  The requirement that police officers "scrupulously honor" a suspect's desire to cease questioning derives from the pressures inherent in custodial interrogation.  <u>See</u> <u>id.</u> at 104.

- 6 -

However, the protection afforded by <u>Miranda</u> applies only when a suspect is subjected to custodial interrogation. <u>Davis v. Allsbrooks</u>, 778 F.2d 168, 170-71 (4th Cir. 1985). <u>See</u> <u>Pruett v. Commonwealth</u>, 232 Va. 266, 272, 351 S.E.2d 1, 4 (1986) (explaining that <u>Miranda</u> does not apply to a police officer's general questioning of citizens in the course of the fact-finding process). <u>Cf.</u> <u>Tipton v. Commonwealth</u>, 18 Va. App. 832, 835, 447 S.E.2d 539, 540 (1994) (holding that the right to an attorney does not apply when invoked during non-custodial interrogation).

Weber was not in custody at the hospital. Because he was not in custody when he stated his desire not to talk, that assertion did not invoke <u>Miranda</u> to bar the use of his subsequent statements.

C. <u>RIGHT TO COUNSEL</u>

Weber contends that his continued interrogation by the police after he requested an attorney violated <u>Edwards v. Arizona</u>, 451 U.S. 477 (1981). We disagree.

First, Weber argues that at the hospital, prior to accompanying the officers to the police station, he asked to speak with an attorney.

> <u>Edwards</u> held that when an accused, during a <u>custodial interrogation</u>, invokes the right to have counsel present, the police may not resume the interrogation until the individual re-initiates communications and waives his right to counsel. The <u>Edwards</u> rule has not been expanded to include non-custodial demands for an attorney . . . .

<u>Tipton</u>, 18 Va. App. at 834, 447 S.E.2d at 540 (citation omitted)

(emphasis in original).  Weber was not in custody at the hospital.  Accordingly, his assertion at the hospital did not invoke the rule in Edwards.

Next, Weber argues that the police impermissibly questioned him after he requested counsel while in custody.  See Edwards, 451 U.S. at 484-85.  The operation of the Edwards rule requires an initial finding that the suspect properly invoked his right to counsel.  See Eaton v. Commonwealth, 240 Va. 236, 253-54, 397 S.E.2d 385, 395-96 (1990) (holding that a suspect must assert his right to counsel clearly); Midkiff v. Commonwealth, 250 Va. 262, 266, 462 S.E.2d 112, 115 (1995) (assertion must be "clear and unambiguous").

"Whether an individual requested counsel is a factual determination, and that finding will not be disturbed on appeal unless clearly erroneous."  Pugliese v. Commonwealth, 16 Va. App. 82, 87, 428 S.E.2d 16, 21 (1993) (citation omitted).  Evans, Chupik and Williams all denied that Weber requested an attorney, "an event which police officers would be expected to observe and remember."  Id.  The trial court "believe[d] and accept[ed] the testimony of the investigative officers that the defendant never clearly and unambiguously invoked his right to counsel."  The evidence supports this ruling.

### D.  VOLUNTARINESS OF STATEMENT

Weber contends that the length and circumstances of his custody and interrogation render his statements to the police

involuntary as the products of duress and coercion.

In Bottenfield v. Commonwealth, 25 Va. App. 316, 487 S.E.2d 883 (1997), we stated that:

> The Commonwealth has the burden to prove, by a preponderance of the evidence, that a defendant's confession was freely and voluntarily given. In determining whether a statement or a confession was voluntary, the trial court must decide whether the statement was the "product of an essentially free and unconstrained choice by its maker," or whether the maker's will "has been overborne and his capacity for self-determination critically impaired." In so deciding, the trial court must look to "the totality of all the surrounding circumstances." The court must consider the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview. Because only state action may violate a criminal defendant's due process rights, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."

Id. at 323, 487 S.E.2d at 886-87 (citations and quotations omitted) (emphasis in original).

Weber completed high school, attended a year of college, completed two years of advanced electronics training in the United States Navy and was graduated from a private investigation school. He acknowledged that he understood his Miranda rights and signed a form stating that he wished to make a statement to the police. Before administering the polygraph examination, the polygraph examiner reminded Weber that he could assert his legal rights. Evans, Chupik and Williams testified that they neither

threatened Weber nor promised him anything in return for his statement. In his final statement, Weber confirmed that the police had not threatened him and that he had been well treated. He subsequently reviewed, corrected and signed this statement.

The lengthy course of interrogation raises concern as to whether the duration and constraints of custody amounted to coercion. However, the interviews themselves were relatively short. Before, during and after the interviews, Weber was treated with respect. He was afforded necessary comforts. He was provided food, drink, cigarettes, and the use of rest room facilities. He took short naps. On more than one occasion, he went outside for fresh air. He never protested that he felt tired or weakened.

The trial court found that Weber's statements were the product of an essentially free and unconstrained choice and that Weber's will was not overborne despite the circumstances and conditions of his custody. The trial court found no evidence of police promises or "trickery." The record supports these findings.

On appeal from a trial court's decision on a suppression motion, "it is clear that we must conduct an independent review of the question whether a confession is voluntary. However in making that determination, we are bound by the trial court's subsidiary factual findings unless those findings are plainly wrong." Wilson v. Commonwealth, 13 Va. App. 549, 551, 413 S.E.2d

655, 656 (1992).  Based upon our review of the record, we hold
that Weber's statements were made voluntarily.  He waived his
right to remain silent knowingly and voluntarily, without
coercion, threats or promises, and after being fully advised of
his Miranda rights.  Accordingly, the trial court did not err in
denying his motion to suppress his statements to the police.

### E.  DELAY IN BRINGING BEFORE MAGISTRATE

Weber contends that the police delayed unnecessarily in
bringing him before a magistrate.  He argues that the delay
transformed his lawful custody into an unconstitutional
detention, requiring exclusion of any evidence derived from that
detention.

Code § 19.2-80 provides, in pertinent part:

> [A]n officer making an arrest under a warrant
> or capias shall bring the arrested person
> without unnecessary delay before and return
> such warrant or capias to a court of
> appropriate jurisdiction . . . .

However:

> [N]ot every violation of the requirement that
> a suspect be taken before a magistrate
> without unnecessary delay results in the
> exclusion of evidence.  Only in a situation
> where the delay in taking a suspect before a
> magistrate resulted in the loss of
> exculpatory evidence have we concluded that
> the defendant's due process rights were
> violated and reversed his conviction.  In all
> other cases, though we have acknowledged
> violation of the statute, we found no
> deprivation of the defendant's constitutional
> rights.

Horne v. Commonwealth, 230 Va. 512, 518-19, 339 S.E.2d 186, 191

- 11 -

(1986) (citations omitted).  The record discloses no loss of exculpatory evidence.

Assuming, without deciding, that the delay caused by interrogating Weber was unnecessary, we hold that the delay was a mere procedural statutory violation, not a denial of a constitutional right.  Therefore, the statements obtained during the delay were properly admitted.  See id. at 519, 339 S.E.2d at 191; Alatishe v. Commonwealth, 12 Va. App. 376, 379, 404 S.E.2d 81, 83 (1991).

II.  SUFFICIENCY OF EVIDENCE

Weber contends that the evidence was insufficient to support his conviction for second-degree murder.  He argues that the Commonwealth failed to prove that his conduct caused the baby's death.

On November 17, 1994, at 5:15 p.m. Robin Weber arrived home and handed the baby to Weber.  In his final statement to the police, Weber explained:

> I was getting a little frustrated, and I got up to open the windows.  And I hollered at Robin about not opening the windows.  It was getting hot in there.  She should know better with her cooking that it was getting hot.  She apologized.
>
> I went back in the room, and he was still crying.  I went to sit down and he was still crying.  I went to sit down.  I was getting really frustrated and I took him from my shoulder, and I was like, "What is wrong?"  And I gave him two quick jerks.  I didn't realize it was so rough.
>
> *  *  *  *  *  *  *
>
> Well, I asked him "what's wrong?" and I put him on my shoulder and rocked him.  His arm was up around my neck, and it started to drift down to my chest.  I took him off my chest, because he was starting to feel really limp, and I looked at him, and he was really -- and he was real dreamy-eyed.  And I said, "Robin, come in here, there's something wrong," and I shook him, like I said before, like a washing machine just side-to-side, trying to get a response from him, and he cried a little bit.  She came in, and I said "There's something wrong."  And I put him up on my hand and lifted him up over so he could rest on my hand horizontally -- he was just limp over my hand.  I brought him back down, and I tried to get a response, and I slapped him on his face on both sides trying to get something out of him.  He cried a little

- 13 -

bit . . . .

                  *    *    *    *    *    *    *

Q:          And he went limp after you shook
            him?

WEBER:      Yes.

Q:          How many times do you think you
            shook him?

WEBER:      Twice.

Q:          Could you describe for me how you
            shook him?

WEBER:      It was quick jerks.

Q:          Where were your hands?

WEBER:      Underneath his chest like this.
            His armpits were in the crux of my
            thumb and my finger, my thumb and
            my index finger.

Q:          And you jerked him back and forth?

WEBER:      Yes.

Q:          And right after that is when you
            put him on your chest?

WEBER:      Yes.

Q:          And that's when you noticed that he
            started going limp?

WEBER:      Yes.

Q:          When did you strike his ears or the
            side of his head?

WEBER:      His face.  I thought I was just
            smacking his face. . . .

Q:          Which hand did you strike him with?

WEBER:      My right.

Q:          And with both sides of your hands,

- 14 -

```
                or --

WEBER:      Yes.

Q:          How many times would you say you
            struck him?

WEBER:      I'd say once on each side, about,
            yea.  No, it was twice, first cross
            hand then back hand, and then cross
            hand and back hand.

Q:          But he was fine up until the point
            where you shook him; is that
            correct?

WEBER:      Yes.
```

Dr. Zaritsky testified that the infant suffered from retinal hemorrhaging, subdural hemorrhaging and significant trauma to the brain, resulting in swelling.  In addition, there was bruising on the infant's cheeks, ears, ribs, and the left side of the chin. Dr. Zaritsky stated that these symptoms were consistent with a diagnosis of Shaken Baby Syndrome.  He testified that two factors produced the baby's death:  (1) shaking that produced severe swelling of the brain; and (2) the lapse of time before treatment.  Dr. Leah Bush, Assistant Chief Medical Examiner, concurred in this diagnosis.

Dr. Zaritsky testified that the event that caused the swelling of the brain occurred six to twelve hours before the baby was brought to the hospital, or between 7:00 a.m. and 1:00 p.m.  He concluded from his review of the baby's blood density that the injuries occurred within the previous week.  He testified that the swelling of the brain was consistent with

Weber's statement that the baby became limp.

"On appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. The jury's verdict will not be disturbed on appeal unless it is plainly wrong or without evidence to support it." Maynard v. Commonwealth, 11 Va. App. 437, 439, 399 S.E.2d 635, 637 (1990) (en banc) (citations omitted). When the sufficiency of the evidence is challenged on appeal, "it is our duty to look to that evidence which tends to support the verdict and to permit the verdict to stand unless plainly wrong." Snyder v. Commonwealth, 202 Va. 1009, 1016, 121 S.E.2d 452, 457 (1961).

Weber argues that, although the evidence proved that he shook and slapped the baby, it failed to prove that these acts inflicted the baby's fatal injuries. He notes that Dr. Zaritsky testified that the injuries that caused the baby's brain to swell were suffered six to twelve hours prior to examination of the baby in the hospital. Weber argues that this testimony established a time frame proving that the baby's fatal injuries were suffered several hours before the events described in his confession. We find this argument unpersuasive. The jury, as finder of fact, was not required to accept every detail of each witness' testimony. Rather, it was the duty of the jury, upon determining credibility and weight, to view the evidence as a body and thus to determine the facts proven by that body of

evidence.

The baby, though fretful, was in good condition until Weber shook and slapped him. Following that assault, the baby went limp and lapsed quickly into the condition from which he never recovered. That condition was consistent with trauma resulting from an assault such as Weber admitted inflicting on the baby. The jury was not obliged to accept Weber's account of when the shaking and slapping took place; nor was it obliged to accept that the brain swelling fit precisely within the time frame described by Dr. Zaritsky.

Weber further argues that even should the evidence be deemed sufficient to prove that he inflicted the baby's fatal injuries, it failed to prove that he did so maliciously. We disagree. "A trier of fact may infer that a person intends the natural consequences of his or her acts." Hernandez v. Commonwealth, 12 Va. App. 669, 672, 406 S.E.2d 398, 400 (1991). "In determining the probable consequences of an aggressor's actions and his or her intent to achieve those consequences, the comparative weakness of the victim and the strength of the aggressor may be considered." Campbell v. Commonwealth, 12 Va. App. 476, 485, 405 S.E.2d 1, 5 (1991) (en banc). Weber admitted that he was "frustrated." He, a grown man, held the victim, a twenty-nine-day-old baby, upright in his hands and shook the baby side to side with "quick jerks." He then smacked the baby's face, twice forehand, and twice backhand. The brutality of this

assault supports the jury's finding of malice.

### III.  DENIAL OF MISTRIAL

During rebuttal argument at the sentencing phase of the trial, the Commonwealth's attorney stated to the jury:

> [Defense counsel] told you yesterday this was a tragedy for everyone involved.  Ladies and gentlemen, child abuse is a tragedy for every human being, and Andrew Joseph represents that.  Child abuse is a tragedy.

The trial court sustained Weber's objection to this argument but denied his motion for a mistrial.

Weber contends that the quoted argument sought to inflame the jury and to incite it to punish him for crimes committed by others.  We read no such purpose or effect into the quoted argument.  The argument responded to defense counsel's earlier observation that the death of the baby was a tragedy for all involved.  The argument acknowledged the truth of that observation and went on to observe the undeniable fact that child abuse is a tragedy for all society.  This argument in no way sought to thrust upon Weber responsibility for anything other than the crime for which he had been convicted.  It neither sought nor served to inflame the jury or to incite it to take an improper view of the case.  We find no error in the trial court's denial of Weber's motion for a mistrial.

The judgment of the trial court is affirmed.

Affirmed.
