UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Huff, Judges Decker and Russell
Argued at Chesapeake, Virginia

JORDAN DIANGELO CHAMPION

MEMORANDUM OPINION* BY
v.        Record No. 1596-16-1          CHIEF JUDGE GLEN A. HUFF
                                        OCTOBER 24, 2017
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
H. Thomas Padrick, Jr., Judge

        Taite A. Westendorf, Senior Assistant Public Defender, for
        appellant.

        Benjamin H. Katz, Senior Assistant Attorney General (Mark R.
        Herring, Attorney General, on brief), for appellee.


        Jordan Diangelo Champion ("appellant") appeals his convictions of first-degree murder,

in violation of Code § 18.2-32; use of a firearm in the commission of a felony, in violation of

Code § 18.2-53.1; and conspiracy to commit a felony, in violation of Code § 18.2-22.  Appellant

filed a pretrial motion to suppress statements made to law enforcement in the Circuit Court of the

City of Virginia Beach ("trial court").  Following the trial court's denial of this motion, appellant

entered a conditional guilty plea to the charges reserving the right to challenge the denial on

appeal.  The trial court accepted this plea and convicted appellant of the offenses, sentencing him

to life imprisonment for the murder, ten years' imprisonment for the conspiracy, and three years'

imprisonment for the use of a firearm in the commission of a felony.  Pursuant to the terms of the

conditional plea agreement, appellant raises two assignments of error challenging the denial of

his motion to suppress:

_____
        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

1. The trial court erred in denying appellant's motion to suppress his statements to police because the Commonwealth did not carry their burden of proving that appellant knowingly, intelligently, and voluntarily waived his Miranda rights.

2. The trial court erred in denying appellant's motion to suppress his post-Miranda statements because the police employed a deliberate "two step" or bifurcated interrogation strategy and the midstream Miranda warnings were ineffective and deprived the appellant of the knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them.

For the reasons that follow, this Court affirms the trial court's ruling.

## I. BACKGROUND

"When reviewing a denial of a motion to suppress evidence, an appellate court considers the evidence in the light most favorable to the Commonwealth and will accord the Commonwealth the benefit of all reasonable inferences fairly deducible from that evidence." Branham v. Commonwealth, 283 Va. 273, 279, 720 S.E.2d 74, 77 (2012) (citing Sidney v. Commonwealth, 280 Va. 517, 520, 702 S.E.2d 124, 126 (2010)). In doing so, this Court "consider[s] facts presented both at the suppression hearing and at trial." Testa v. Commonwealth, 55 Va. App. 275, 279, 685 S.E.2d 213, 215 (2009). So viewed, the evidence is as follows.

Virginia Beach police responded to a report of gunfire at the 5900 block of Clear Springs Court on the evening of October 29, 2013. There they found Kristopher Lee ("Lee") suffering from multiple gunshot wounds, from which he later died. Investigators recovered physical evidence, including clothing and a firearm, from the scene and gathered reports from witnesses that connected appellant, Dau-Shawn Newton ("Newton"), and Cartrell Taylor ("Taylor") to Lee's death. As the investigation progressed, Detectives J.K. Cole ("Cole") and T.M. Jones ("Jones") interviewed Newton and Taylor, who provided information about the events leading up to the shooting. The detectives learned that Lee's girlfriend, a woman identified only as "La

La," had been in communication with Newton, and they suspected she was responsible for luring Lee to the scene where he was ambushed. They also determined that appellant and La La were "pretty close." Based on their investigation, the detectives identified appellant as their primary suspect for Lee's murder.

Cole and Jones drove to appellant's house on November 7, 2013. They arrived in plain clothes and in an unmarked car. When appellant met them on the front porch, the detectives identified themselves as police officers and told appellant that they wished to talk with him about "some things that had been happening in the neighborhood." They asked if appellant would be willing to come with them to their office to do so, and appellant agreed. They left for police headquarters with appellant sitting in the front passenger seat. The vehicle's doors were unlocked and, except for a seatbelt, appellant remained unrestrained throughout the journey. As they traveled, the detectives reiterated their understanding that appellant's cooperation was voluntary and that "he did not have to speak with [the detectives] at any time."

Upon arrival, the detectives brought appellant into an interview room where the entire interview, which began at 6:22 p.m., was recorded on video. Cole offered appellant water and a bathroom break before beginning the interview, and at appellant's request, he kept the door to the interview room partially open. Cole then expressed his appreciation for appellant's willingness to talk with the detectives and asked him whether he was still willing to talk with them. Appellant confirmed that he was willing, saying, "yeah, no problem, no problem."

The interview had two distinct phases. The first phase lasted approximately one hour and consisted of the detectives' efforts to build a rapport with appellant and learn what appellant knew about recent conflicts in his neighborhood. Appellant mentioned that "the big event that happened out there was when the dude got murdered out there and that's the only thing I heard." Appellant clarified that he only knew what the news had reported when Cole asked what

- 3 -

appellant had heard about Lee's death. Cole then asked where appellant had been when Lee was shot, and appellant said he was in the home of a friend named Bryan located in the Ipswich neighborhood of Chesapeake. As the first hour of the interview drew to a close, Cole explained that the information appellant had shared was inconsistent with what he had learned from previous interviews with Newton, Taylor, and other witnesses, as well as evidence such as telephone records. He informed appellant that based on the evidence, he suspected appellant had killed Lee. Cole then told appellant, "[y]ou're not leaving here tonight."

After leaving the room for around ten minutes, the detectives returned and the following exchange occurred:

> [Cole]: I'm going to advise you of your legal rights real quick. Have you ever had these read to you before?
> [Appellant]: No.
> [Cole]: Okay. I'm going to read them to you, all right? You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning; if you wish. You can decide at any time to exercise these rights and not answer any questions or make any statements. Do you understand?
> [Appellant]: (Shakes head affirmatively)
> [Cole]: Is that a yes?
> [Appellant]: (Shakes head affirmatively) Mm-hmm.

Cole told appellant he could not leave and advised him of his Miranda rights just over one hour into the interview. This exchange marked the beginning of the second phase of the interview, which lasted approximately five additional hours.

Cole opened the second phase by revealing the information police had gathered during their investigation, including detailed maps of appellant's movements leading up to the shooting, then asked whether appellant was in Ipswich during the shooting as he had earlier claimed. Appellant maintained that he had been in Ipswich and took no part in the shooting. After the

detectives presented appellant with his own telephone records, however, appellant changed his narrative and recounted the route by which he, Newton, and Taylor arrived at the scene that night. When Jones raised the possibility of executing a search warrant at appellant's home that night to search for a firearm, clothing, and appellant's cell phones, appellant admitted that the pistol the police already recovered was the one he used to shoot Lee and that the jacket it was inside belonged to him as well. Appellant eventually confessed to shooting Lee multiple times, but did not provide any additional information regarding La La's role or explain how he knew where to find Lee on the night of the murder.

As the interview concluded, Cole offered appellant the opportunity to call his family:

> Hello. Wassup Dad? It's true, Dad—It's true. It's true, Dad. Yeah. Yeah, Dad. I know, I know. . . . I know ya'll are disappointed and all that. I know ya'll is. I disobeyed you. I did everything you told me not to do, but I did it anyway. I said I'm sorry. I did everything I wasn't supposed to do and I ended up doing it anyway—staying out of trouble and I'm sorry that I disappointed you and Mama. . . . I know what I did. Dad, no matter what I did I gotta, I just gotta, I just pay the sacrifice. I'm sorry. It is. It's a lot, Dad. . . . I'm sorry, Dad. You didn't do nothing, Dad. It was all me. Nah, nobody forced me. I'm sorry Dad. I gotta give the phone back, I just wanted to let ya'll know that. I love ya'll.

The interview concluded at 12:53 a.m. on November 8, 2013. At no point during the interview did appellant attempt to invoke his right to silence or counsel or otherwise reference the Miranda warnings he had received.

Prior to trial, appellant submitted a motion to suppress all statements made to the detectives during the November 7, 2013 interview, contending that the entire interview was custodial and therefore the initial portion prior to the Miranda warnings contaminated the entire interview. During the evidentiary hearing, the Commonwealth called Cole to recount the events of the interview. On cross-examination, counsel for appellant challenged Cole's use of the phrase "real quick" in introducing the Miranda warnings as being a rhetorical device to minimize

their importance. Cole testified that despite saying "real quick," he in fact "slowed down very much so and articulated very well so that [appellant] understood and could clearly understand and comprehend each one of his rights." The Commonwealth then rested.

The defense called James Champion, appellant's father, who testified that appellant had been in special education classes from his early school days through high school. Champion further noted that appellant "had a hard time understanding, comprehending things," but said that "[o]nce he caught on to what his teacher was saying, he understood." During cross-examination, Champion testified that appellant had graduated high school with a general diploma. He also testified that he received a phone call from appellant in the early morning hours of November 8 in which appellant acknowledged that he had committed the crime and understood what he was doing.

After hearing the evidence and reviewing supplemental briefing, the trial court denied appellant's motion to suppress. In so ruling, the trial court found that appellant was not in custody for Miranda purposes until the second phase of the interview, when Cole informed appellant he was not free to leave and read him the Miranda warnings. The trial court observed that although there was no written Miranda waiver in this case, Cole advised appellant of the Miranda rights and then took "the extra step or steps to make sure that he understood [them]" and noted that "that's clearly shown on the video." The trial court then ruled that the Commonwealth had carried its burden of proving that appellant knowingly, intelligently, and voluntarily waived his Miranda rights and that "the interrogation interview that occurred after that as it continued was appropriate under the circumstances." This appeal followed.

## II. STANDARD OF REVIEW

"On appeal, the burden rests with appellant to show that the denial of his suppression motion constituted reversible error." Kuhne v. Commonwealth, 61 Va. App. 79, 86, 733 S.E.2d

- 6 -

667, 670 (2012) (quoting Harris v. Commonwealth, 276 Va. 689, 695, 668 S.E.2d 141, 145 (2008)). This Court "is bound by the trial court's findings of historical fact unless plainly wrong or without evidence to support them, and 'must give deference to the inferences that may be drawn from those factual findings.'" Id. (quoting Commonwealth v. Hilliard, 270 Va. 42, 49-50, 613 S.E.2d 579, 584 (2005)). In contrast, "the trial court's application of defined legal standards to the particular facts of a case" is subject to *de novo* review. Robinson v. Commonwealth, 63 Va. App. 302, 310, 756 S.E.2d 924, 927 (2014) (quoting Cary v. Commonwealth, 40 Va. App. 480, 486, 579 S.E.2d 691, 694 (2003)).

"The inquiry whether a waiver of Miranda rights was made knowingly and intelligently is a question of fact, and the trial court's resolution of that question is entitled on appeal to a presumption of correctness." Rodriguez v. Commonwealth, 40 Va. App. 144, 155-56, 578 S.E.2d 78, 83 (2003) (quoting Harrison v. Commonwealth, 244 Va. 576, 581, 423 S.E.2d 160, 163 (1992)). The trial court's conclusion as to whether a waiver of Miranda rights was knowing and intelligent "must be based on the totality of the circumstances and 'will not be disturbed on appeal unless plainly wrong.'" Id. at 156, 578 S.E.2d at 83 (quoting Watkins v. Commonwealth, 229 Va. 469, 477, 331 S.E.2d 422, 430 (1985)). Whether a statement is voluntary, however, "is ultimately a legal rather than a factual question, but subsidiary factual decisions are entitled to a presumption of correctness." Robinson, 63 Va. App. at 310, 756 S.E.2d at 927 (quoting Rodriguez, 40 Va. App. at 155, 578 S.E.2d at 83). Thus this Court is also bound by the trial court's subsidiary factual findings unless they are plainly wrong. Wilson v. Commonwealth, 13 Va. App. 549, 551, 413 S.E.2d 655, 656 (1992).

III.  ANALYSIS

On appeal, appellant argues that he did not knowingly, intelligently, and voluntarily waive his Miranda rights and that the detectives deliberately used an impermissible two-step interrogation strategy that undermined the Miranda warnings.

A.  Miranda waiver

The well-known warnings that police must give to criminal suspects in custody prior to interrogation were developed by the United States Supreme Court in order to "assure that the individual is accorded his privilege under the Fifth Amendment to the Constitution not to be compelled to incriminate himself." Miranda v. Arizona, 384 U.S. 436, 439 (1966).  In order to enforce the Miranda protections, that Court created an exclusionary rule covering unwarned statements:  "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Id. at 444.

As with other constitutional rights, an accused may waive his or her privilege against self-incrimination and right to counsel "provided the waiver is made voluntarily, knowingly, and intelligently." Bradshaw v. Commonwealth, 228 Va. 484, 489, 323 S.E.2d 567, 570 (1984).  "Assessing whether a confession is voluntary requires an examination of the totality of the circumstances to determine whether the statement is the 'product of an essentially free and unconstrained choice by its maker,' or whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'" Rodriguez, 40 Va. App. at 157, 578 S.E.2d at 84 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).  In determining whether the waiver of Miranda was knowing, intelligent, and voluntary, this Court "must consider both 'the details of the interrogation' and 'the characteristics of the accused.'" Id. (quoting Kauffmann v. Commonwealth, 8 Va. App. 400, 405, 382 S.E.2d 279, 281 (1989)).  "Proof of

'coercive police activity is . . . a necessary predicate to a finding that a waiver of <u>Miranda</u> rights is not voluntary.'" <u>Id.</u> at 157, 578 S.E.2d at 83 (quoting <u>United States v. Cristobal</u>, 293 F.3d 134, 141 (4th Cir. 2002)).

Appellant contends that the manner in which the detectives brought him to headquarters, the length of the interrogation before providing warnings, his education level and unfamiliarity with the criminal justice system, the way the detectives administered the <u>Miranda</u> warnings, and alleged threats made by the detectives against his family are evidence that appellant's confession was not voluntary. Importantly, appellant does not assign error to the trial court's finding that appellant was not in police custody for <u>Miranda</u> purposes until the second phase of the interview. "[T]he protection afforded by <u>Miranda</u> applies only when a suspect is subjected to *custodial* interrogation." <u>Webber v. Commonwealth</u>, 26 Va. App. 549, 557, 496 S.E.2d 83, 87 (1998) (emphasis added). Because it is unchallenged, the trial court's ruling as to when appellant began to be in custody is binding on this Court. As such, appellant's arguments that the detectives used subterfuge to lure appellant into coming to headquarters and that the detectives improperly interviewed appellant for over an hour before providing warnings, both of which are premised on the notion that the detectives were obligated to provide <u>Miranda</u> warnings to appellant before they actually did, are waived. <u>See</u> Rule 5A:12(c)(1)(i) ("Only assignments of error assigned in the petition for appeal will be noticed by this Court."); <u>Harlow v. Commonwealth</u>, 195 Va. 269, 271, 77 S.E.2d 851, 853 (1953) ("The purpose of assignments of error is to point out the errors with reasonable certainty in order to direct this court and opposing counsel to the points on which appellant intends to ask a reversal of the judgment, *and to limit discussion to these points*." (emphasis added)).

According to due weight to the trial court's factual findings in this fact-intensive inquiry, this Court concludes upon a review of appellant's remaining contentions that appellant knowingly, intelligently, and voluntarily waived his <u>Miranda</u> rights.

## 1. Personal Characteristics

The record reveals that appellant sufficiently understood his situation and chose to continue speaking with police. "In cases involving defendants with low intellectual ability, the knowingness of the waiver often turns on whether the defendant expressed an inability to understand the rights as they were recited." <u>United States v. Robinson</u>, 404 F.3d 850, 861 (4th Cir. 2005). Although appellant's father testified that appellant had taken special education classes, he also indicated that appellant was capable of understanding the concepts he was taught and that he graduated with a general diploma. Further, despite appellant's inexperience with the criminal justice system, appellant maintained that he understood what had happened and accepted responsibility for what he had done during the telephone call with his father. At no point did appellant indicate that he was confused by Cole's warnings or what was happening in the interrogation. The evidence thus supported the trial court's finding that appellant fully understood his <u>Miranda</u> rights.

## 2. Minimization of <u>Miranda</u> Warnings

Appellant further argues that by prefacing the <u>Miranda</u> rights with the phrase "real quick" and not using a written <u>Miranda</u> waiver form, the detectives minimized the import of the warnings and induced appellant to waive his rights. "A valid waiver of <u>Miranda</u> rights does not require the waiver to be in writing." <u>Jackson v. Commonwealth</u>, 266 Va. 423, 432, 587 S.E.2d 532, 540 (2003). Detective Cole testified that although he used the words "real quick" in transitioning to the <u>Miranda</u> warnings, he actually read them slowly and articulated clearly to make sure appellant understood his rights. The trial court credited this testimony, finding that

Cole fully advised appellant of his <u>Miranda</u> rights and that appellant then waived them. Although the trial court observed that the detectives did not use a written waiver form in this case, it also noted that "of course, <u>Miranda</u> does not require that the form be used." Accordingly, the evidence also supported the trial court's conclusion that the phrase "real quick" and lack of a written waiver did not prevent appellant from knowingly and intelligently waiving his rights.

### 3. Alleged Threats

Appellant lastly argues that the detectives coerced appellant's confession by threatening to "execute a search warrant at his parents' home in the middle of the night" and suggesting that his "parents could be handcuffed in the street" if he refused to confess. This characterization misconstrues the detectives' statements.

A confession's validity "is not equated with the absolute absence of intimidation." <u>Hill v. Commonwealth</u>, 52 Va. App. 313, 319, 663 S.E.2d 133, 136 (2008). "<u>Miranda</u>'s prohibition against threats, trickery or cajolery was not intended to preclude in all circumstances trickery concerning merely one aspect of the factual strength of the case against the accused." <u>Wilson</u>, 13 Va. App. at 554, 413 S.E.2d at 658 (quoting <u>Foster v. Commonwealth</u>, 8 Va. App. 167, 175, 380 S.E.2d 12, 16 (1989)). In this case, however, the totality of the circumstances supports a finding that appellant was not impermissibly threatened into his waiver. <u>See</u> <u>Foster</u>, 8 Va. App. at 175, 380 S.E.2d at 16.

The record reveals that the "threats" to which appellant refers were merely retrospective suggestions that the detectives had already been more courteous than necessary to appellant. Cole said:

> We did you a favor tonight. We came to your house. Could we
> have come in with SWAT and flash bangs—the whole nine yards?
> Could we have? We could have. Instead it was Detective Jones
> and I. . . . Came to you as human beings, okay? We didn't get into
> it with your family, okay? We saved you that. What you want to
> tell them is your business. You're a grown adult.

Later in the interview, Cole continued this line of thought:

> I showed you some respect at your house. I'm not rolling up in there with a SWAT team and dogs and all this kind of stuff— which we very well could have done. But based on who we thought you were, your record, all right. We didn't think this is the person that you are. Right now you're proving me wrong. Apparently you are this kind of person. Maybe we should've rolled up in there with a SWAT team, drug you out and handcuffed your parents and all that kind of stuff. How do you think they would have liked that? They probably wouldn't have been too happy would they?

These statements, couched in past tense, do not contain affirmative threats to take action against appellant's family. They do not promise any sort of illegitimate action, nor do they contain any deliberate falsehood.

Later, Jones asked appellant: "The gun recovered in the bushes in the jacket—did you use that gun to shoot him?—or do I have to get a search warrant for your parent's house and wake everybody up to look for it . . . ." This is the only statement made by one of the detectives that can be interpreted as a potential threat. Even given its intimidating nature, the statement contains no falsehood and refers only to a legitimate course of police conduct. Compared to Cole's retrospective statements, Jones' reference to a search warrant does not imply any harm would come to appellant's parents other than the inconvenience of being awakened. The trial court thus properly concluded that none of these statements were sufficiently coercive to overbear appellant's will.

Viewed together, the circumstances surrounding appellant's interrogation did not undermine his decision to waive his <u>Miranda</u> rights and reveal the information he did. The record demonstrates that appellant avoided providing the detectives information beyond that which they already knew. In fact, despite repeated questioning, appellant refused to illuminate La La's role in the crime or how he knew where to find Lee on the night of the murder. Appellant's steady evasion on these topics demonstrates that neither the duration nor nature of

- 12 -

the interview served to overbear his will or compromise his capacity for self-determination. Accordingly, this Court holds that the trial court did not err in concluding that appellant knowingly and intelligently waived his <u>Miranda</u> rights.

## B. Two-Step Interrogation

Appellant next argues that the method by which the detectives interrogated appellant constituted an impermissible "two-step" strategy designed to undermine the <u>Miranda</u> warnings. As previously noted, however, appellant does not challenge the trial court's finding that he was not in custody for <u>Miranda</u> purposes until the interview's second phase. Because he was not in custody during the first phase of the interview, it is of no legal consequence that he had not received <u>Miranda</u> warnings at that point. <u>See</u> <u>Webber</u>, 26 Va. App. at 557, 496 S.E.2d at 87 ("[T]he protection afforded by <u>Miranda</u> applies only when a suspect is subjected to *custodial* interrogation."). Accordingly, this Court does not reach appellant's two-step interrogation argument and holds that, as determined above, appellant's statements were admissible.

## IV. CONCLUSION

Because the trial court's denial of the motion to suppress was not error, this Court affirms appellant's convictions.

<u>Affirmed.</u>