**Bernice SLWOOKO, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–8747.

Court of Appeals of Alaska.

July 21, 2006.

Rehearing Denied Aug. 17, 2006.

Michael R. Smith, Boston, Massachusetts, for the Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Bernice Slwooko appeals her conviction for second-degree murder. At Slwooko's trial, the State introduced evidence of Slwooko's self-incriminatory statements to the police. In this appeal, Slwooko argues that her statements should have been suppressed; Slwooko contends that the police obtained the statements in violation of her rights under *Miranda v. Arizona.*[1]

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694

In our previous decision in this case, *Slwooko v. State,* Alaska Memorandum Opinion No. 5003, 2005 WL 2093690 (August 31, 2005), we remanded this case to the superior court for additional findings on two questions: (1) was Slwooko in custody for *Miranda* purposes when she made the self-incriminatory statements? and, if so, (2) did Slwooko waive her rights before making the statements?

We have now received the superior court's findings, and the parties have filed supplemental memoranda in response to those findings.

The superior court concluded that Slwooko was not in custody when she arrived at the police station and began to speak to the police. However, the superior court concluded that the interview became custodial when the police officers continued to interview Slwooko even after she stated that she did not wish to answer the officers' questions.

For the reasons explained in this opinion, we agree with the superior court's first conclusion (that Slwooko was not in custody when the interview commenced), but we disagree with the superior court's second conclusion (that the interview became custodial after Slwooko stated that she did not wish to answer questions). Instead, we conclude that the interview remained non-custodial until after Slwooko confessed and described her participation in the homicide.

Slwooko also claims that, during her trial, the prosecutor violated Alaska Evidence Rule 613 by introducing evidence of a defense witness's prior inconsistent statements without first confronting the witness with those statements and giving him a chance to deny or explain the prior statements. This claim is baseless; the record shows that the prosecutor complied with Evidence Rule 613.

For these reasons, we affirm Slwooko's conviction.

### Underlying facts

Here is a summary of the facts, taken from our previous opinion:

(1966).

Bernice Slwooko and Jacob Anagick met in Nome in early August, 2002, and they became romantically involved. Slwooko and Anagick stayed, off and on, with the victim, Jimmy Jack.

On the mid-morning of August 18, 2002, Anagick walked into the Nome police station and reported that he had murdered Jack. Anagick told the police that he and Jack started fighting and that the altercation escalated until, ultimately, Anagick killed Jack by striking him in the head with an axe.

Officer Jens Noet placed Anagick under arrest and then left for Jack's residence. When no one answered his knock, Noet pried open the door and found Jack dead on the living room floor. An axe was leaning against the kitchen table. Noet examined the axe handle and concluded that someone had wiped the handle after the homicide— because the handle was covered in blood up to a certain point and then was completely clean.

Noet returned to the police station to interview Anagick more fully. Anagick reiterated that he had killed Jack by striking him "two or three times" with the axe. When Officer Noet asked Anagick if anyone else had been in the house at the time, Anagick stated that "he was all alone with Jimmy", and that "nobody else was there". Then Anagick made a statement that Noet thought was strange: Anagick declared, "If you check the axe for fingerprints, [mine] . . . will be the only fingerprints . . . on the axe." This volunteered information about the absence of anyone else's fingerprints struck Officer Noet as "an odd statement to make."

A little later that same day, a woman named Pauline Brown telephoned the police to tell them about an encounter she had had with Bernice Slwooko. Brown told the police that she had encountered Slwooko earlier that day and that, during their conversation, Slwooko told Brown that she had murdered Jimmy Jack the night before. Slwooko also told Brown that she had needed to change out of her clothes and her shoes, and to "get rid of them", because they were bloody.

Armed with this new information, Nome Police Officer Daniel Bennett re-interviewed

Anagick about the homicide. Anagick again recounted how he had fought with Jack and how he had struck him in the head several times with the axe. Bennett then asked Anagick if he had spoken to anyone about the homicide. When Anagick declared that he had told no one, Bennett remarked that "Bernice Slwooko seems to know quite a bit about this". Bennett then asked Anagick if Slwooko had been present during the homicide. Anagick first said "no". Then he said "yes". Then Anagick whispered, "What the hell is she doing?"

After hearing Anagick's responses, Bennett decided to speak with Pauline Brown. Brown confirmed her earlier report about her conversation with Slwooko, in which Slwooko confessed her involvement in the homicide.

The police began looking for Slwooko. Sometime after 4:30 p.m., Bennett spotted a crying woman in the company of two men in front of the Polar Arms Motel. Bennett approached this woman and discovered that she was Bernice Slwooko. According to Bennett, Slwooko was very distraught and drunk. Slwooko told Bennett, "I need to talk to you."

When Bennett asked Slwooko if she was willing to get into his patrol car and accompany him to the station, Slwooko agreed. Bennett also asked the two men to join them. The men got into the back of the patrol car, while Slwooko took the front passenger seat. Slwooko got into the patrol car unassisted, and she was not restrained in any way.

When they arrived at the police station, Slwooko was initially hesitant to go into the building, and Bennett had to encourage Slwooko to come in and talk to him:

> *Officer Bennett:* [O]nce we got to the police station, . . . there was a little bit of hesitation for her to go inside the police department, and I encouraged her. I said, "It's real important [and] we need to talk." And I said, "Please, Bernice, come and talk to me." And [then] she walked in[to] the police station.

Under cross-examination, Bennett admitted that he may have placed his hand on Slwooko's arm or back to guide her into the building. Bennett testified that this entire

episode of hesitation lasted about ten seconds.

Once inside the station, Bennett led Slwooko to the back office which was normally used by the chief of police, and which was also used as an interview room. According to Bennett, Slwooko never expressed any unwillingness to go into this interview room.

In the meantime, Officer Noet briefly questioned Slwooko's two male companions and then told them that they could go. Noet then joined Bennett in the interview room with Slwooko. During the ensuing interview, Slwooko made the self-incriminatory statements that are the subject of this appeal.

*Details of the interview*

At the evidentiary hearing in this case, Officer Bennett testified that when he conducted a non-custodial interview at the police station, he would normally confirm that the person was at the police station voluntarily, and that the person was free to leave or to stop the conversation anytime they wanted. Bennett further testified that he would normally assure the person that, no matter what they said during the interview, they would not be arrested.

However, because of the information that the police had received from Pauline Brown, Bennett had already decided that he was going to arrest Slwooko if Slwooko confirmed her involvement in the homicide. Accordingly, Bennett decided that he should issue *Miranda* warnings to Slwooko.[2]

The following is a transcription of the pertinent portion of the interview:

*Officer Bennett:* Bernice, right now I'm gonna—since you're in the police department I want to ask you some questions, okay? ... And I want you to understand your rights, okay? You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford one, one will be appointed to

you by the courts. Do you understand your rights? (Pause)[3] Would you like to answer some questions for me?

*Slwooko:* No.

*Bennett:* No? Okay.

*Noet:* [To Bennett] Did you ask her anything already?

*Bennett:* No, I haven't asked ...

*Slwooko:* Yeah, well ...

*Bennett:* ... her nothing.

*Slwooko:* ... I want to be—why am I being arrested?

*Bennett:* You're not being arrested. I'm sorry, I didn't—I didn't want to arrest you. But since you're in the police station, I have to read you your rights, just because ...

*Noet:* (indiscernible) ...

*Bennett:* ... you're in the police station.

*Noet:* ... talk to anybody.

*Bennett:* You know, ...

*Noet:* We, we just want to know—we would like to know what happened at Jimmy Jack's.

*Slwooko:* I really don't know.

*Noet:* What ...

*Bennett:* Okay.

*Noet:* Well, Jacob [Anagick] was arrested for hurting Jimmy Jack, and Jacob says that you helped him hurt Jimmy Jack.

*Bennett:* Well, not exactly. But ... I just got done talking to Jacob, okay? And he said that I needed to come and talk to you. So [do] you want to tell me what happened? Okay?

*Slwooko:* Exactly?

*Bennett:* Exactly.

*Slwooko:* I'll tell you this. We were going over to pick up my box. I'm the one that hit him with the axe while he was putting his head down. Exactly twice, and ...

*Bennett:* It's okay. Take your time.

---

**2.** This Court's prior opinion, *Slwooko v. State,* Memorandum Opinion No. 5003, contains a transcript excerpt in which Officer Noet is listed as the speaker who administered *Miranda* warnings to Slwooko. This is not correct. The speaker was Officer Bennett.

**3.** On remand, the superior court specifically addressed the issue of whether Officer Bennett asked these two questions as a compound question or as two separate questions. The court found that Bennett paused between the two questions, thus separating them.

*Slwooko:* The third time, he decided to do it, you know. And I said, "No, I'll do it." And I—I (indiscernible).

*Bennett:* Okay.

*Slwooko:* Really sorry (indiscernible).

Slwooko then proceeded to explain how the homicide occurred. She told the police that Anagick wrestled Jack to the ground, and then she hit Jack twice with the axe. At this point, Jack "was still breathing", so Anagick struck Jack a third time with the axe. Then, according to Slwooko, she took up the axe again and "practically chopped [Jack's] head off".

Slwooko explained that she and Anagick agreed that he (Anagick) would take "all the blame" for the homicide.

At this point, Noet once again administered *Miranda* warnings to Slwooko. Slwooko expressly waived her rights, and then she once more recounted the homicide. This time, Slwooko explained how she had dumped her bloody clothing in the rocks near downtown Nome, and then obtained a room at the Polar Arms. She also told the police that she was still wearing the same shoes that she had worn during the murder, and she even pointed out some blood stains that she had been unable to wipe off. Slwooko then accompanied the officers to the place where she had hidden her clothing.

### The superior court's supplemental findings on remand

As we explained at the beginning of this opinion, we remanded Slwooko's case to the superior court for additional findings on two questions: (1) was Slwooko in custody for *Miranda* purposes when she made her self-incriminatory statements? and, if so, (2) did Slwooko waive her rights before making the statements?

On remand, Superior Court Judge Ben Esch found that, even though Officer Bennett asked Slwooko to come to the police station to be interviewed, and even though

Bennett transported Slwooko to the station in his patrol car, Slwooko initiated this series of events by telling Officer Bennett that she needed to talk to him. Judge Esch further found that Slwooko "did not evidence any unwillingness to accompany the officer to the station".

Judge Esch found that the interview lasted less than thirty minutes, and that the two police officers who interviewed Slwooko asked their questions "in a non-confrontational and polite fashion", without any threats or intimidation. Although the door to the interview room was closed, there was no evidence that the police restrained Slwooko in any overt fashion.

Based on these circumstances, Judge Esch concluded that a reasonable person in Slwooko's situation "would have felt free to break off the questioning". Under our case law, this is equivalent to a finding that Slwooko was not in custody.[4]

But even though Judge Esch concluded that the interview was not custodial when it began, the judge concluded that the interview became custodial later—when Bennett and Noet "[decided] not to terminate the interview [after Slwooko] said that she did not wish to talk to the officers". According to Judge Esch, the officers' decision to continue talking to Slwooko "require[d] [him] to conclude that, at that point, [Slwooko] was no longer free to go".

The parties have now filed memoranda addressing Judge Esch's findings. Slwooko takes issue with Judge Esch's conclusion that she was not in custody when the interview began. The State takes issue with Judge Esch's conclusion that the interview became custodial when, after Slwooko stated that she did not wish to answer questions, the officers continued to interview her.

### Was Slwooko in custody for Miranda purposes when the interview began?

As explained above, Judge Esch concluded that Slwooko was not in custody when

---

4. *See State v. Anderson,* 117 P.3d 762, 766 (Alaska App.2005): "The standard for determining *Miranda* custody is objective: *Miranda* warnings are required [when] police interrogation [is] conducted under circumstances in which a 'reasonable person would feel he was not free to leave and break off the questioning'." (quoting *Carr v. State,* 840 P.2d 1000, 1003 (Alaska App.1992), with the internal quote from *Hunter v. State,* 590 P.2d 888, 895 (Alaska 1979)).

she began her interview with the police. Judge Esch found that Slwooko initiated the interview by telling Officer Bennett that she needed to talk to him, and that Slwooko then agreed to travel with Bennett to the police station to speak with the officers.

■ A person's interview with police officers does not become custodial simply because it occurs at a police station. *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983). Rather, the pertinent question is whether the person being interviewed is present at the station of their own will.

The Alaska Supreme Court acknowledged and applied this principle in *Henry v. State*, 621 P.2d 1 (Alaska 1980). The defendant in *Henry* was a suspect in a burglary. The police asked Henry to come to the station for an interview, and they transported him to this interview in a patrol car. The supreme court nevertheless upheld the trial court's decision that Henry had gone to the station of his own free will and, based on this conclusion, the supreme court agreed that the police had not been required to advise Henry of his *Miranda* rights. *Henry*, 621 P.2d at 2–4.

In Slwooko's brief to this Court, she points out that, according to Bennett's testimony, Slwooko showed some hesitation to enter the building, and Bennett then encouraged her with words and, possibly, by putting a hand on her arm or back. Slwooko argues that this hesitation, and Bennett's response, show that Judge Esch was wrong when he concluded that Slwooko entered the police station willingly.

■ Slwooko's subjective willingness to enter the building is a question of fact, and we must defer to Judge Esch's finding unless we are convinced that it is clearly erroneous.[5] Moreover, we must view the evidence pertaining to this issue in the light most favorable to upholding Judge Esch's decision.[6]

One could certainly argue, based on Slwooko's last-minute hesitancy to enter the police station, that she had changed her mind about wanting to talk to the police. But this is only one possible inference that might be drawn from the evidence. Viewing the interaction between Slwooko and Bennett as a whole, Judge Esch could reasonably conclude that, despite Slwooko's hesitation at the door to the police station, Slwooko did in fact still wish to speak to the police, and that she freely chose to go into the building and begin her interview with the officers.

■ Slwooko also points out that, after she entered the interview room, the officers closed the door, and neither Officer Bennett nor Officer Noet explicitly told Slwooko that she was free to leave. These are facts that might support a finding of custody, but these facts are not determinative. As our supreme court explained in *State v. Smith*, 38 P.3d 1149 (Alaska 2002), the question of *Miranda* custody must be assessed by examining the totality of the circumstances and then asking whether, "given [these] circumstances, . . . a reasonable person would have felt [that] he or she was not at liberty to terminate the interrogation and leave". *Id.* at 1154.[7] More precisely, the ultimate inquiry is "whether there was a formal arrest or [a] restraint on [the person's] freedom of movement of the degree associated with a formal arrest". *Id.* at 1154.[8]

Here, Slwooko told Officer Bennett that she needed to speak to him, and she then agreed to accompany Bennett to the police station. The fact that Slwooko initiated the contact with the police is a factor that weighs against a finding of custody. *Smith*, 38 P.3d at 1155. Likewise, the fact that the interview occurred in the middle of the day weighs against a finding of custody. *Id.* at 1156–57. Additionally, the fact that the police expressly told Slwooko that she was not

---

5. *See Wilburn v. State*, 816 P.2d 907, 911 (Alaska App.1991).

6. *See Schaffer v. State*, 988 P.2d 610, 612 (Alaska App.1999).

7. Citing *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995).

8. Quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983), which in turn quotes *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977).

under arrest weighs against custody. *Id.* at 1157.

Regarding the tone of the officers' questions to Slwooko, Judge Esch found that the officers asked their questions "in a non-confrontational and polite fashion", without any threats or intimidation. This fact, too, weighs against a finding of custody. *Id.* at 1157.

It is true that the door to the interview room was closed while the officers questioned Slwooko. However, the door was apparently not locked, for Judge Esch found that the police did not restrain Slwooko in any overt fashion.

Judge Esch found that Slwooko was being questioned because the police considered her a suspect in the homicide. But the police officers' suspicion that Slwooko was involved in the homicide does not affect the assessment of whether she was in custody for *Miranda* purposes, unless that suspicion was communicated to Slwooko in a manner that would convince a reasonable person in Slwooko's situation that the police were not going to let her go.

The United States Supreme Court addressed this point in *Stansbury v. California*:

> We hold, not for the first time, that an officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment [of] whether the person is in custody.
>
> . . .
>
> Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.
>
> . . .
>
> It is well settled ... that a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question [of] whether the individual is in custody for purposes of *Miranda*.

511 U.S. 318, 319, 323, 324, 114 S.Ct. 1526, 1527,1529–1530, 128 L.Ed.2d 293 (1994).

The mere fact that the police question a person about the person's potential involvement in a crime does not, by itself, suggest that the interview was custodial. If, however, the questions are accusatorial in tone, and if the questions are posed in a manner suggesting that the police have already reached a conclusion about the person's guilt, then this can support a finding of custody. *Smith,* 38 P.3d at 1158–59.

For instance, in *Motta v. State,* 911 P.2d 34, 39 (Alaska App.1996), this Court held that an initially non-custodial interview later became custodial because of the sharply accusatory nature of the questioning and the fact that the police would not allow the suspect to leave the interview room. But that was not the situation in Slwooko's case.

Judge Esch found that the officers employed a "non-confrontational and polite" tone during their interview with Slwooko. The closest approach to accusatory questioning occurred when Officer Noet tried to encourage Slwooko to talk about the homicide by telling her that her boyfriend, Jacob Anagick, had said that she was involved. But Officer Bennett immediately interjected that this was "not exactly" true. The real situation, Bennett told Slwooko, was that he (Bennett) had "just got done talking to Jacob", and that Jacob had simply told Bennett that he "needed to come and talk to [Slwooko]." Upon hearing this, Slwooko began describing her role in the homicide. Thus, Slwooko's decision to begin confessing her role in the homicide was not a response to confrontational and accusatory questioning.

The fact that Slwooko was arrested immediately following the interview is a factor that weighs in favor of custody, but only slightly. As the supreme court explained in *Smith,* events following the interview carry only "limited weight":

> [Whether a suspect is taken into custody following the interview] cannot by itself be the determinative test for custody.... [A] court must determine whether the defendant was in custody when he made the incriminating statements; it is illogical to rest that judgment primarily on something

that occurs after the defendant has made the statements.

*Smith,* 38 P.3d at 1159.[9]

Thus, the fact that the police arrest a suspect following an interview may shed light on otherwise ambiguous facets of the police officers' interaction with the suspect. But the fact that the police decide to arrest a person after the person has confessed to a serious crime is, of itself, unremarkable. And, as *Smith* explains, it would be illogical to reason backward, from the officers' decision to arrest the person following their confession, to a conclusion that the person must have been in *Miranda* custody when they gave the confession.

When we consider all of the circumstances of Slwooko's interaction with the police, we independently reach the same conclusion as Judge Esch: Slwooko was not in custody for *Miranda* purposes when the interview began. She was not subjected to a degree of restraint associated with a formal arrest, and a reasonable person in Slwooko's position would have felt free to terminate the interview and leave.

*Did the interview become custodial when the officers continued to interview Slwooko after she stated that she did not want to answer any questions?*

▮ Even though Judge Esch concluded that Slwooko's interview with the police was not custodial when it began, the judge concluded that the interview became custodial later—when Bennett and Noet "[decided] not to terminate the interview [after Slwooko] said that she did not wish to talk to the officers". Judge Esch declared that the officers' decision to continue talking to Slwooko "require[d][him] to conclude that, at that point, [Slwooko] was no longer free to go".

As we explained in the preceding section of this opinion, the precise question to be answered is not whether Slwooko was free to go. Rather, the question is whether a reasonable innocent person in Slwooko's position would have believed that they were free to go. We therefore interpret Judge Esch as saying that, based on the officers' decision to keep talking to Slwooko even after she said that she did not wish to answer their questions, a reasonable innocent person in Slwooko's position would have concluded that they were no longer at liberty to end the interview and leave.

Given our conclusion that Slwooko was not in custody at the beginning of the interview, the question is whether anything happened during the interview (before Slwooko began to confess her role in the homicide) that would convince a reasonable person in Slwooko's position that things had changed, and that she was now being detained by the police.

There is no dispute regarding the pertinent facts (*i.e.,* the progress of the interview: who said what, and when). Only a question of law remains. We exercise our independent judgement in assessing the legal significance of these facts—*i.e.,* whether, under these facts, Slwooko was in custody for *Miranda* purposes.[10]

To perform this analysis, we return to the transcription of the interview.

The interview began with Officer Bennett telling Slwooko that he wanted to ask her some questions, and then advising Slwooko of her *Miranda* rights. Courts generally agree that the giving of *Miranda* warnings does not convert a non-custodial interview into a custodial one (although it is a factor that a court may consider when assessing custody).[11] In the present case, even if Bennett's decision to give *Miranda* warnings made Slwooko uncertain as to her status, that uncertainty was dispelled when Slwooko asked why she had been arrested, and Bennett assured her that she was not under arrest.

---

9. Citing *Hunter v. State,* 590 P.2d 888, 895 n. 23 (Alaska 1979).

10. *See State v. Smith,* 38 P.3d 1149, 1154 (Alaska 2002).

11. *See, e.g., United States v. Bautista,* 145 F.3d 1140, 1148 (10th Cir.1998); *Booker v. Ward,* 94 F.3d 1052, 1058 (7th Cir.1996); *State v. Stanley,* 167 Ariz. 519, 809 P.2d 944, 948, 950 (Ariz. 1991). *See also Commonwealth v. Morgan,* 416 Pa.Super. 145, 610 A.2d 1013, 1014 (1992), *appeal denied,* 533 Pa. 618, 619 A.2d 700 (1993).

Immediately after Officer Bennett recited the *Miranda* warnings to Slwooko, he asked her, "Would you like to answer some questions for me?", and Slwooko answered "No." At this point, the two officers (Bennett and Noet) appeared to be at a loss regarding what to do next. They stopped speaking to Slwooko and began addressing each other:

> *Officer Bennett:* Do you understand your rights? (Pause) Would you like to answer some questions for me?
>
> *Slwooko:* No.
>
> *Bennett:* No? Okay.
>
> *Noet:* [To Bennett] Did you ask her anything already?
>
> *Bennett:* No, I haven't asked ...
>
> *Slwooko:* Yeah, well ...
>
> *Bennett:* ... her nothing.

It was then that *Slwooko* re-initiated the conversation. Apparently prompted by the fact that Bennett had given her *Miranda* warnings, Slwooko asked, "Why am I being arrested?"

Bennett told Slwooko that she was not under arrest. Then Noet added that the officers "just ... would like to know what happened at Jimmy Jack's [house]". Slwooko responded to this information, not by reiterating her unwillingness to answer questions, but by telling the officers that she did not know what had happened at Jimmy Jack's house:

> *Slwooko:* I want to be—why am I being arrested?
>
> *Bennett:* You're not being arrested. I'm sorry, I didn't—I didn't want to arrest you. But since you're in the police station, I have to read you your rights, just because ...
>
> *Noet:* (indiscernible) ...
>
> *Bennett:* ... you're in the police station.
>
> *Noet:* ... talk to anybody.
>
> *Bennett:* You know, ...
>
> *Noet:* We, we just want to know—we would like to know what happened at Jimmy Jack's.
>
> *Slwooko:* I really don't know.
>
> *Noet:* What ...
>
> *Bennett:* Okay.

At this point, Noet tried to elicit a response from Slwooko by telling her that her boyfriend, Jacob Anagick, had said that she helped him hurt Jimmy Jack. Bennett was apparently unwilling to go along with this falsehood, so he told Slwooko a different, less accusatory falsehood: that Anagick had simply told the police to speak to Slwooko. Bennett then again asked Slwooko if she "want[ed] to tell [him] what happened". With hardly any further prompting, Slwooko began to confess her role in the homicide:

> *Noet:* Well, Jacob was arrested for hurting Jimmy Jack, and Jacob says that you helped him hurt Jimmy Jack.
>
> *Bennett:* Well, not exactly. But ... I just got done talking to Jacob, okay? And he said that I needed to come and talk to you. So [do] you want to tell me what happened? Okay?
>
> *Slwooko:* Exactly?
>
> *Bennett:* Exactly.
>
> *Slwooko:* I'll tell you this. We were going over to pick up my box. I'm the one that hit him with the axe while he was putting his head down. Exactly twice, and
> ...
>
> *Bennett:* It's okay. Take your time.
>
> *Slwooko:* The third time, he decided to do it, you know. And I said, "No, I'll do it." And I—I (indiscernible).
>
> *Bennett:* Okay.
>
> *Slwooko:* Really sorry (indiscernible).

Although the two officers were clearly trying to get Slwooko to talk to them, they said nothing coercive and, with the exception of Noet's accusation—which Bennett immediately disavowed—they said nothing directly accusatory. Moreover, Bennett expressly assured Slwooko that she was not under arrest.

Given our conclusion that Slwooko was not in custody when this colloquy began, the question is whether there is anything in the above-quoted excerpt that would convince a reasonable person in Slwooko's position that things had changed, and that she was now being detained by the police. There is nothing to support such a conclusion. Accordingly, we disagree with Judge Esch's ruling on this issue. Slwooko was not in custody at the end of the above-quoted conversation.

In her brief to this Court, Slwooko argues that this is the wrong legal analysis. Slwooko points out that she clearly answered "No" the first time that Bennett asked her if she was willing to answer questions. Slwooko argues that, after the police received this response from her, the officers were legally forbidden from pursuing any further efforts to get Slwooko to talk to them.

This is the rule that would apply if Slwooko had been in *Miranda* custody. In *Michigan v. Mosley*, 423 U.S. 96, 104, 96 S.Ct. 321, 326–27, 46 L.Ed.2d 313 (1975), the United States Supreme Court held that when a suspect who is undergoing custodial interrogation invokes their right to silence, that right must be "scrupulously honored"—*i.e.*, the police must immediately cease their questioning.[12]

But Slwooko was not in custody. The question, then, is whether the *Mosley* rule applies to Slwooko's non-custodial interview—or whether, instead, the police were permitted to continue their efforts to get Slwooko to talk to them, even though Slwooko initially stated that she did not wish to answer their questions.

Many courts have addressed this point of law. These courts are virtually unanimous in concluding that the *Mosley* rule does not apply to situations where, during a non-custodial interview, the person being interviewed declares that they do not wish to answer further questions.

The reasoning behind these rulings is this: The Fifth Amendment does not forbid the government's use of any and all self-incriminatory statements; rather, the Fifth Amendment forbids the government's use of compelled statements. The *Miranda* rule was designed to counter the compulsions, both overt and subtle, that are inherent in custodial interrogation—that is, interrogation that occurs while a suspect is held *incommunicado* in a police-dominated atmosphere. But when police questioning does not take place in a custodial setting, the person being questioned is not subjected to the types of compulsion that the *Miranda* rule addresses.

Thus, unless the police engage in conduct that overbears the person's will and renders their statements involuntary under a traditional Fifth Amendment analysis, the police may continue to try to interview a suspect even though the suspect states that they do not wish to answer questions.

The Seventh Circuit explained this principle in *United States v. Serlin*, 707 F.2d 953 (7th Cir.1983):

> [The defendant] argues that the [government] agents were required to cease all questioning when he expressed reluctance [to] meet[ ] with them or [to] cooperat[e] in the investigation. In support of this claim[, the] defendant cites *Michigan v. Mosley* ....
>
> *Mosley* involved application of the holding in *Miranda v. Arizona* .... In both of these cases[,] the [United States Supreme] Court was concerned about the coercive atmosphere created by custodial interrogation. The inherent coerciveness of custodial interrogation prompted the Court in *Miranda* to devise several safeguards of the suspect's right not to answer questions, including a requirement that the police advise the suspect that he has the right not to incriminate himself. Should the suspect exercise the right to cut off questioning the police must "scrupulously honor" this request and cease all questioning. This cease-questioning rule stems from the Court's recognition that "[w]ithout the right to cut off questioning, the setting of in-custody interrogation operates on the will of the individual to overcome free choice in producing a statement after the privilege has once been invoked." [*Mosley,*] 423 U.S. at 100–01, 96 S.Ct. at 324–25 (quoting *Miranda v. Arizona*, 384 U.S. at 473–74, 86 S.Ct. at 1627).
>
> [But unlike] our review of custodial interrogation, in which it is our duty to determine whether the police "scrupulously honored" a request to cease questioning, [our duty] in reviewing noncustodial interrogation ... is "to examine the entire rec-

---

12. *See also Miranda v. Arizona*, 384 U.S. 436, 473–74, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966) ("[I]f the individual indicates in any man-

ner ... that he wishes to remain silent, the interrogation must cease.").

ord and make an independent determination of the ultimate issue of voluntariness." [*Beckwith v. United States,*] 425 U.S. [341,] 348, 96 S.Ct. [1612,] 1617[, 48 L.Ed.2d 1 (1976),] (quoting *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966)).

*Serlin,* 707 F.2d at 957–58.

Courts from around the country agree that, during non-custodial questioning, the police need not immediately stop their efforts when the person being questioned expresses a desire not to speak further:

See *State v. Lang,* 176 Ariz. 475, 862 P.2d 235, 244 (Ariz.App.1993) ("Police may continue to question suspects who are not in custody, even though they invoke their right to remain silent, as long as the responses are voluntary and the person's will has not been overborne."); *State v. Silva,* 106 Idaho 14, 674 P.2d 443, 449 (Idaho App.1983) ("Silva was not in custody for purposes of *Miranda.* Consequently, the police did not violate any *Miranda*-based right by continuing to talk with him after he said he did not want to answer questions."); *State v. P.Z.,* 152 N.J. 86, 703 A.2d 901, 910–911 (1997) ("[T]he issue [of whether the questioning could continue] turns on [the defendant's] non-custodial status. Had [the] defendant been in custody at the time of the interview, under New Jersey law his request, however ambiguous, to terminate questioning would have been sufficient to trigger his right to remain silent.... However, [the] defendant was not in custody when he answered the caseworker's questions. Although he was free to remain silent and to insist upon having his lawyer present, the circumstances were not such as to require [the caseworker] to stop the interview when [the] defendant said that his lawyer had advised him not to discuss the matter with anyone."); *State v. Jeffreys,* 165 Vt. 579, 682 A.2d 951, 953 (1996) ("[T]here is no right to cut off questioning where the suspect is not in custody."); *Webber v. Commonwealth,* 26 Va.App. 549, 496 S.E.2d 83, 86–87 (1998)

("Weber [*sic* ] contends that the police violated his rights under *Miranda v. Arizona* . . . by continuing to question him after he stated at the hospital that he did not want to talk to anybody. Because Weber was not in custody at that time, this assertion did not invoke *Miranda* protections. . . . [T]he protection afforded by *Miranda* applies only when a suspect is subjected to custodial interrogation."); *State v. Warness,* 77 Wash.App. 636, 893 P.2d 665, 667 (Wash.App.1995) ("The *Miranda* protection is premised on custodial interrogation. Both factors [*i.e.,* custody plus interrogation] must be present for *Miranda* protection to attach. A suspect who is not in custody does not have *Miranda* rights."); *State v. Bradshaw,* 193 W.Va. 519, 457 S.E.2d 456, 467 (1995) (holding that the defendant's attempt to invoke *Miranda* rights before being taken into custody was an "empty gesture"). *See also Davis v. Allsbrooks,* 778 F.2d 168, 170–71 (4th Cir.1985).

We note that, in *State v. Garrison,* 128 P.3d 741 (Alaska App.2006), this Court applied the same principle to a case where, during a non-custodial interrogation, the person being questioned made an ambiguous statement that was arguably a reference to their need for an attorney. The defendant in *Garrison* argued that the rule of *Edwards v. Arizona*[13] applied—*i.e.,* that the police were obliged to halt their questioning and clarify Garrison's wishes regarding the assistance of counsel. We held that *Edwards* did not apply because Garrison was not in custody:

To the extent that Garrison argues that the police had to stop and clarify Garrison's reference to an attorney, that argument has no merit. . . . Garrison was not in custody, and the requirement, under *Edwards v. Arizona,* that the police stop an interview when a defendant makes an equivocal request for counsel applies [only] to custodial interrogations.

*Garrison,* 128 P.3d at 747 (footnotes omitted).[14]

---

13. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

14. Our decision in *Garrison* is in accord with the decisions of other courts on this point. *See United States v. Bautista,* 145 F.3d 1140, 1147 (10th

Cir.1998); *Tukes v. Dugger,* 911 F.2d 508, 515–516 (11th Cir.1990); *United States v. Hampton,* 153 F.Supp.2d 1262, 1273 (D.Kan.2001); *State v. Stanley,* 167 Ariz. 519, 809 P.2d 944, 950 (Ariz. 1991) ("[E]ven though a suspect [who is not in custody] invokes his right to decline further in-

Slwooko was not in custody when Officer Bennett asked her if she was willing to answer questions, and she replied "no". Because Slwooko was not in custody at this point, the *Mosley* rule did not apply. The officers were not obliged to "scrupulously honor" Slwooko's desire not to answer questions by ceasing all efforts to interview her. Instead, the officers were free to make further efforts to get Slwooko to talk to them—provided that their efforts did not become so coercive as to overbear Slwooko's will and produce statements that were involuntary under a traditional Fifth Amendment analysis.

As the Seventh Circuit explained in *Serlin,*

Although the "scrupulously honor" test is not our guide in [cases of non-custodial questioning], we will [nevertheless] consider the [officers'] persistence in questioning [the] defendant in the face of his stated desire not to cooperate. This is, however, but one factor in determining the voluntariness of [the] defendant's statements.

*Serlin,* 707 F.2d at 958.

■ We have already analyzed Bennett's and Noet's efforts to get Slwooko to talk to them after she stated that she did not want to answer questions. We concluded that, although Bennett and Noet were clearly trying to get Slwooko to talk to them, the officers said nothing coercive and, with the exception of Noet's accusation—which Bennett immediately disavowed—they said nothing directly accusatory. Moreover, Bennett expressly assured Slwooko that she was not under arrest. We concluded that nothing in the officers' colloquy with Slwooko would convince a reasonable person in Slwooko's position that she was in *Miranda* custody. For much the same reasons, we conclude that the officers said nothing to Slwooko that

was so coercive as to overbear her will and produce involuntary statements.

In sum: We uphold Judge Esch's ruling that Slwooko's interview with the police was initially non-custodial, but we conclude that Judge Esch erred when he ruled that Slwooko's interview with the police later became custodial. The interview remained non-custodial—and, because of this, the police were authorized to continue their efforts to engage Slwooko in conversation even though she initially stated that she did not wish to answer their questions. Finally, we conclude that Slwooko's self-incriminatory statements to the police were voluntary. Accordingly, these statements were admissible against Slwooko at her trial.

*Slwooko's claim that the prosecutor violated Evidence Rule 613 by introducing evidence of Jacob Anagick's prior inconsistent statements without first giving Anagick an opportunity to deny or explain those statements*

■ Jacob Anagick testified as a defense witness at Slwooko's trial. At the time of his testimony, Anagick had already pleaded guilty to second-degree murder for killing Jimmy Jack. On direct examination, Anagick declared that he alone committed this murder, and that Slwooko was not present and did not participate in the killing-although Anagick conceded that Slwooko later helped him conceal or destroy evidence of the crime.

As we have already explained, Anagick was interviewed by Officer Bennett shortly after the homicide. Anagick initially told Bennett that he alone was responsible for Jimmy Jack's death, and that no one else was present when Jimmy Jack was killed. But when Bennett confronted Anagick with the fact that "Bernice Slwooko seems to know quite a bit about this", and when Bennett

terrogation until he has spoken to a lawyer, the police may continue to question him in a non-custodial setting.... [S]o long as [his] responses are voluntary, and his will has not been overborne, the suspect's responses may be used in evidence against him."); *Commonwealth v. Morgan,* 416 Pa.Super. 145, 610 A.2d 1013, 1016 (1992), *appeal denied,* 533 Pa. 618, 619 A.2d 700 (1993) (holding that even though the police "took the precautionary step of reading *Miranda* rights to a non-custodial suspect", the suspect could

not assert the Fifth Amendment right to counsel outside the context of custodial interrogation); *State v. Aesoph,* 647 N.W.2d 743, 751 (S.D.2002) ("[T]here is no [Fifth Amendment] right to an attorney when the interrogation is non-custodial."); *Tipton v. Commonwealth,* 18 Va.App. 832, 447 S.E.2d 539, 540 (1994) (holding that the right to an attorney does not apply when invoked during non-custodial interrogation); *Webber v. Commonwealth,* 26 Va.App. 549, 496 S.E.2d 83, 87 (1998).

then asked Anagick if Slwooko had been present during the homicide, Anagick first said "no", and then he said "yes", and then Anagick whispered, "What the hell is she doing?"

Officer Bennett testified during the State's case-in-chief, and he recounted this conversation with Anagick. There was no objection to this testimony.

During the rebuttal portion of the State's case, the prosecutor presented the testimony of two other police officers who interviewed Anagick about the homicide.

Anagick was interviewed by Officer Noet immediately after Noet and Bennett conducted their interview with Slwooko (the interview we have described at length in the preceding sections of this opinion). During Noet's interview with Anagick, Anagick stated that he and Slwooko and Jimmy Jack were together at Jimmy Jack's house, and that he (Anagick) and Jimmy Jack began fighting. At some point during the fight, Slwooko struck Jimmy Jack in the head with an axe, and Jimmy Jack lost consciousness. Anagick and Slwooko conferred or "communicated to some degree" and determined that Jimmy Jack was still breathing. Anagick then used the axe to kill him.

Anagick was also interviewed by Officer Byron Redburn. This interview took place at the Anvil Mountain Correctional Center on the morning of August 20, 2002—that is, two days after Slwooko confessed her role in the murder and Anagick made the statements to Noet that we described in the previous paragraph. According to Redburn, Anagick's August 20th account of the homicide was quite similar to Anagick's testimony at Slwooko's trial: that is, Anagick claimed to have acted alone in killing Jimmy Jack, but he stated that Slwooko helped him conceal or destroy evidence of this crime.

Slwooko's defense attorney objected to Officer Noet's testimony on the ground that the prosecutor had assertedly violated Evidence Rule 613. That is, the defense attorney argued that the prosecutor had not laid a proper foundation for Noet's testimony by first cross-examining Anagick about his purported inconsistent statements and giving Anagick an opportunity to deny or explain these statements. The trial judge denied this objection and allowed Noet to give the testimony we have described above.

(The defense attorney did not object to Redburn's testimony on Rule 613 grounds— probably because Redburn testified to prior statements that were *consistent* with Anagick's trial testimony.)

On appeal, Slwooko argues that the trial judge's ruling was error. She renews her contention that the prosecutor violated Evidence Rule 613 by failing to cross-examine Anagick about the statements he made to Noet.

The record shows otherwise. Here is the pertinent portion of the prosecutor's cross-examination of Anagick:

*Prosecutor:* Now, you talked to Officer Bennett, . . . correct?

*Anagick:* Yes.

. . .

*Prosecutor:* And you told him that Bernice [Slwooko] was there . . .

*Anagick:* No.

*Prosecutor:* . . . when Jimmy [Jack] was killed, didn't you?

*Anagick:* No.

*Prosecutor:* Didn't you say—[Bennett] asked you, "Was Bernice there?", and you said, "Yes. What the hell is she doing?"

*Anagick:* No.

*Prosecutor:* You never said that?

*Anagick:* I said "What's she doing?" because I saw her walk in the door and ended the conversation. . . .

*Prosecutor:* . . . I'm asking you, Do you remember telling Officer Bennett—in response to his question, "Was Bernice there when Jimmy got killed?"—"Yes. What the hell is she doing?"

*Anagick:* No. I don't remember saying that.

*Prosecutor:* And when Officer Noet came out to see you on [August] 18th at the jail, [do] you remember talking to him?

*Anagick:* Yes.

*Prosecutor:* Okay, and that was after he had talked to Bernice, correct?

*Anagick:* I guess so.

*Prosecutor:* And he's ... trying to clarify that she [*i.e.*, Slwooko] was there. And you told him, "Yeah, she was there."

*Anagick:* No.

*Prosecutor:* You didn't tell him that? Or you don't remember telling him that?

*Anagick:* I didn't tell him that.

. . .

*Prosecutor:* Didn't you tell Officer Noet that, as you stood there in Jimmy Jack's house, you and Bernice communicated in some way that Jimmy was still breathing, and that you'd finish him off?

*Anagick:* No.

This excerpt shows that the prosecutor complied with Evidence Rule 613 during his cross-examination of Anagick, laying a proper foundation for Noet's later testimony concerning Anagick's inconsistent statements.

█ In her reply brief, Slwooko no longer argues that this foundation was insufficient. Rather, she advances a new argument: that Rule 613 precludes testimony concerning a witness's prior inconsistent statement unless that testimony is corroborated by physical evidence—for example, a writing that incorporates the prior statement, or an electronic recording of the prior statement. Because this argument is presented for the first time in Slwooko's reply brief, we need address it no further.[15]

### Conclusion

Slwooko's conviction for second-degree murder is AFFIRMED.

COATS, Chief Judge, dissenting.

COATS, Chief Judge, dissenting.

I would affirm Judge Esch's conclusion that Bernice Slwooko was in custody when she admitted her involvement in the murder of Jimmy Jack. Because Slwooko had not waived her rights at the time that she made her initial admissions, I conclude that the

superior court was required to suppress those admissions.

When the police conduct a custodial interrogation, they must warn the person of her *Miranda* rights. The police must have the person waive those *Miranda* rights before asking any questions. Whether a person is in custody for purposes of *Miranda* can be simply stated—would a reasonable person have felt that she was not at liberty to terminate the interrogation and leave?[1]

In the present case, I agree with Judge Esch's finding that Slwooko voluntarily went to the police station. But Slwooko, who was highly intoxicated, was hesitant to enter the police station when she arrived there. Officer Daniel Bennett encouraged her to come in to talk to him. He stated that he guided her by the arm into the police station and into the interview room. From this sequence of events, it appears that Slwooko was having second thoughts about whether she wanted to talk to the police.

Officer Bennett testified that he conducted his interview with Slwooko as a custodial interview. He stated that he had been trained to tell a person in a non-custodial interview that she was free to go at any time or could stop the questioning whenever she wanted. He would establish that the person being questioned was in the police station voluntarily and would assure her that, no matter what she said in the interview, she would not be arrested and would be free to go.

Officer Bennett stated that he did not follow this procedure when he questioned Slwooko. Because he believed that Slwooko was involved in killing Jimmy Jack, he did not want to lie to her and tell her that she would be free to go because he intended to arrest her if she admitted some involvement. Accordingly, Officer Bennett did not confirm that Slwooko was at the police station voluntarily, did not tell her that she was free to leave at any time, and did not tell her that she would be able to leave at the end of the

---

**15.** *See Petersen v. Mutual Life Ins. Co. of New York*, 803 P.2d 406, 411 (Alaska 1990); *Hitt v. J.B. Coghill, Inc.*, 641 P.2d 211, 213 n. 4 (Alaska 1982).

**1.** *State v. Smith*, 38 P.3d 1149, 1154 (Alaska 2002).

interview. Instead, he warned her of her rights.

I recognize that Officer Bennett's subjective intent to conduct a custodial interview is not controlling. The question, as we have previously stated, is whether a reasonable person in Slwooko's position would have felt free to terminate the questioning and leave. But, applying an objective standard, it is important to note that the police never established that Slwooko was voluntarily present at the police station, never told her that she was free to cut off questioning and leave at any time, and never told her that she would be free to leave at the conclusion of the interview. Instead of giving Slwooko these assurances, the police warned Slwooko of her rights. From this sequence, I conclude that a reasonable person in Slwooko's position would have known that the police were questioning her as a suspect. And she would have doubted that she was free to terminate the questioning and leave the police station.

After Officer Bennett warned Slwooko of her rights, he asked her whether she understood her rights and whether she would like to answer questions. Slwooko answered "No."

Judge Esch concluded that Slwooko was answering "No" to the second question. That is, Slwooko indicated that she did not want to answer questions. Judge Esch went on to find that, because Slwooko stated that she did not want to talk to the officers, and because the officers did not terminate the interview, at that point Slwooko was no longer free to go and was therefore in *Miranda* custody.

My own view may vary slightly from Judge Esch's. After Slwooko said that she did not want to answer any questions, the police not only did not cease questioning, they increased the pressure. Officer Noet told Slwooko that they had arrested Jacob Anagick "for hurting Jimmy Jack" and that Anagick had told them that Slwooko had "helped him hurt Jimmy Jack." At this point, a reasonable person in Slwooko's position would have recognized that the police were accusing her of killing Jimmy Jack and would have concluded that Anagick had told the police that Slwooko aided him in the murder.

From Slwooko's position, she was a suspect in the murder of Jimmy Jack. It seems clear to me, at this point, a reasonable person in Slwooko's position would not have felt free to break off questioning and leave. She was therefore in *Miranda* custody. She had not waived her rights and had told the police that she did not want to answer questions. The police responded by escalating the questioning.

I recognize that, after her futile attempt to exercise her rights, Slwooko asked why she was being arrested. Officer Bennett told her that she was not being arrested. Officer Bennett's answer does weigh against concluding that Slwooko was in custody. But telling someone that they are not being arrested differs from telling them that they are free to terminate the questioning and leave. To a lay person, the fact that you have not been arrested may merely mean that you have not been formally charged with a crime. It does not necessarily mean that you are free to go.

Therefore, it seems reasonable that, even though Officer Bennett told Slwooko she was not being arrested, she would have serious doubts about whether she was free to terminate questioning and leave. She was never told that she was free to leave. And when she tried to exercise her right to silence, the police ignored this request and continued questioning her.

It is also true that, after Officer Noet told Slwooko that Anagick told the police that Slwooko had helped him hurt Jimmy Jack, Officer Bennett tried to mitigate the statement by saying, "Well, not exactly." But I do not believe that a reasonable person in Slwooko's position would have seen Officer Bennett's statement as withdrawing Officer Noet's statement. Once the police told Slwooko that Anagick "was arrested for hurting Jimmy Jack" and said that Slwooko "helped him hurt Jimmy Jack," Slwooko had every reason to believe that the police had substantial evidence that showed she had helped murder Jimmy Jack. Once the police told Slwooko this, it seems clear to me that a reasonable person in Slwooko's position

would not have concluded that she was free to break off questioning and leave.

I therefore conclude that Slwooko was in custody at the time that she made her statements admitting her involvement in the murder of Jimmy Jack. And because she was in custody, the police needed to warn Slwooko of her rights and obtain a valid waiver of those rights. Although it is clear that the police warned Slwooko of her rights, it is also clear that Slwooko did not waive those rights before she made the incriminating statements. Therefore, in my view, this Court is required to suppress those statements.